560 P.2d 54

**STATE of Arizona, Appellee,**

v.

**Mitchell Thomas BLAZAK, Appellant.**

No. 3099.

Supreme Court of Arizona,
In Banc.

Jan. 20, 1977.

Bruce E. Babbitt, Atty. Gen., by William J. Schafer, III, Chief Counsel, R. Wayne Ford, Thomas G. Bakker, Asst. Attys. Gen., Phoenix, for appellee.

Stanton Bloom, Tucson, for appellant.

STRUCKMEYER, Vice Chief Justice.

Defendant was convicted of two counts of first degree murder, one count of assault with intent to commit murder, and one count of attempted armed robbery. He was sentenced to death on each of the two counts of first degree murder, to a period of not less than eighty years nor more than life on the attempted murder count, and to a period of not less than twenty nor more than thirty years on the attempted armed robbery count. Judgments and sentences affirmed.

The defendant raises fourteen questions on appeal. We will consider them in the order and manner deemed most appropriate to their resolution.

In the early morning hours of December 15, 1973, two men, armed with pistols, entered the Brown Fox Tavern in north Tucson, Arizona. Blazak, who was wearing a ski mask, went to the bar and demanded money. When the bartender did not comply, Blazak shot him four times and then shot a patron sitting nearby. A second patron was wounded. The robbers immediately fled.

The admitted accomplice, one Kenneth Pease, testified at the trial that he and Blazak, together with a neighbor of Blazak, went to a place known as the Lazy Creek Farm near Tucson at about 6:30 p. m. on December 14, 1973. They, along with the residents of the Lazy Creek Farm, drank beer until about 8:00 p. m., at which time the three men left. Pease testified that the neighbor was dropped off at his home and Pease and Blazak continued on to Pease's home. From there, with the intention of committing a robbery, the two men went to a store where Blazak stole two ski masks. The two then drove around Tucson in search of a suitable target, ultimately arriv-

ing at the Brown Fox Tavern some time shortly after midnight. The attempted robbery and the double killings ensued.

Pease testified that it was Blazak who shot the victims. He further testified that after leaving the Brown Fox, they first headed southwest, then by a circuitous route ultimately arrived at their respective homes. The route Pease described included passing the intersection of Allen and River Roads, the location at which a ski mask was found the next morning.

A.R.S. § 13–136[1] reads:

"13–136. Accomplice; testimony and corroboration

A conviction shall not be had on the testimony of an accomplice unless the accomplice is corroborated by other evidence which, in itself and without aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

■ In *State v. Springer,* 102 Ariz. 238, 428 P.2d 95 (1967), we said:

"It is commanded by statute in this state that no conviction shall be had on the testimony of an accomplice unless it is corroborated by other evidence which tends independently to link the defendant with the commission of the offense. A.R.S. § 13–136. Our case law interpreting this statute provides, among other things, that evidence which in only a 'slight' degree tends to implicate the defendant is sufficient to corroborate an accomplice's testimony, *State v. Miller,* 71 Ariz. 140, 224 P.2d 205; that the corroborating evidence need not be sufficient to establish the defendant's guilt, *State v. Goldthorpe,* 96 Ariz. 350, 395 P.2d 708; that the evidence need not directly connect the defendant with the offense but need only tend to do so, *State v. Sheldon,* 91 Ariz. 73, 369 P.2d 917; that the necessary corroboration may be established by circumstantial evidence, *State v. Bagby,*

83 Ariz. 83, 316 P.2d 941; and that, '[i]n the last analysis * * * the facts of each case must govern.' *State v. Sheldon,* supra, 91 Ariz. at p. 79, 369 P.2d at p. 922." 102 Ariz. at 240, 428 P.2d at 97.

In order to sustain a conviction, some corroborating evidence must have been presented at the trial which independently tended to connect the defendant to the crime, even if only to a slight degree.

We said in *State v. Sheldon,* 91 Ariz. 73, 369 P.2d 917 (1962):

"The statute's (Section 13–136) primary requirement is that there be some evidence in the case which is legally sufficient to lend credibility to the statements of the accomplice. It must be evidence which will afford the trier of fact a sufficient basis for *believing* the testimony of the accomplice. But it need not corroborate any particular part of the accomplice's testimony. *Rain v. State,* 15 Ariz. 125, 137 P. 550 (1913). See also *Kingsbury v. State,* 27 Ariz. 289, 232 P. 887, note 5 *supra.* Nor need the 'corroboration * * * be by direct evidence [for] the entire conduct of the defendant may be looked to for corroborating circumstances and if from those circumstances, his connection with the crime may be fairly inferred, the corroboration is sufficient.' *State v. Miller,* 71 Ariz. 140, 146, 224 P.2d 205, 209 (1950)." 91 Ariz. at 79, 369 P.2d at 921–922.

■ The independent testimony which tended to connect Blazak with the crime consisted of, first, the fact that Blazak and the accomplice, Pease, were known to have been together a few hours before the crime. As to this, defendant argues from *State v. Goldthorpe,* 96 Ariz. 350, 395 P.2d 708 (1964), that the accomplice and defendant were seen together shortly before or after the crime is not sufficient corroboration. Were this the only evidence tending to corroborate the accomplice's testimony, it would, indeed, be insufficient. But it is not. Carl Kempe, Director of the Crime Laboratory for the City of Tucson and Pima County, testified that he compared a hair

1. A.R.S. § 13–136 was repealed in 1976. Laws 1976, Ch. 116, § 1.

found on the ski mask with a sample of the defendant's hair, and his comparison established that the hairs were similar. Morris Clark, a Federal Bureau of Investigation agent, with eighteen years of experience in the area of hair comparisons, testified that the hairs from the ski mask and from the defendant were alike in the necessary fifteen microscopic characteristics which they exhibited.

Here, the defendant's connection with the crime may be fairly inferred. First, as stated, Blazak and the accomplice were known to have been together a few hours before the homicide. Second, Blazak wore a ski mask at the time of the shooting and Pease did not. Third, the ski mask which was found the next morning contained hair which was identified as Blazak's. Fourth, the ski mask was purple with a red tassel and nosepiece and white stitching around the eyes, with black stitching around the mouth. While one witness described the ski mask as "red and white on it", another described it as "apparently blue" and the third testified "I thought it was violet. This is purple, but it had red along here and white along here, and white around the mouth, as I recall, and it had some red on top, a red tassel like this. It had red on top of it but this—I don't think it had a black mouth, the one I seen, and I was awful close." We think the foregoing is sufficient to fairly support an inference that the defendant was connected with the crime.

Defendant also argues that the verdicts are contrary to the law and the evidence. In the light of the accomplice's testimony which directly implicates the defendant, as well as the corroborating evidence which "tends to connect" the defendant to the crime, this contention is without merit. We have previously stated:

> "It is only when there is absence of probative facts to support the verdict that a reversal is justified. [Citation omitted.] It is not the function of this court to retry conflict in evidence but only whether it is evidence to support the verdict." *State v. Crawford,* 106 Ariz. 322, 324, 475 P.2d 936, 938 (1970).

■ Defendant argues that the court below should have instructed the jury that Pease was an accomplice as a matter of law. He urges that the court's failure to so instruct the jury, *sua sponte,* was reversible error in that it allowed the jury to decide that Pease was not an accomplice and thereby obviated the need for any corroborating evidence. The result, it is argued, is that the defendant could have been convicted on the accomplice's uncorroborated testimony.

Under the facts of the case, there can be no question but that Pease was an accomplice. The trial judge did instruct the jury regarding the legal definition of an accomplice and the necessity that an accomplice's testimony be corroborated. However, no instruction stating that Pease was an accomplice as a matter of law was requested, or given. While it would have been proper for the court to so instruct the jury, it does not follow that the failure to do so requires a reversal. This issue was squarely met in *State v. Colson,* 17 Ariz.App. 598, 499 P.2d 726 (1972):

> "[T]here is no reversible error simply because such an instruction was not given. The question is whether the record contains sufficient corroboration of [the accomplice's] testimony, since it is well settled that in order to justify a reversal there must not only be error, but error that is prejudicial to the substantial rights of the appellant. Such prejudice will not be presumed but must appear from the record. [Citation omitted.]" 17 Ariz.App. at 602, 499 P.2d at 730.

Since there was sufficient corroboration of Pease's testimony, we hold that there was no prejudicial error in the trial court's failure to instruct the jury that Pease was an accomplice as a matter of law.

■ Defendant asserts that the trial court committed reversible error in allowing the State to introduce into evidence the ski mask found on the alleged escape route. He bases his assertion on a lack of adequate foundation, correctly stating that there never was a positive (meaning absolute) identification of the ski mask as the one

used in the homicide. He incorrectly argues, however, that the mask could not be linked to the defendant.

That the accomplice testified the mask was similar but that he could not be certain it was the mask worn by the defendant, did not destroy its probative force. The relevancy of the mask to the jury's investigation of the crime cannot be denied. An inference could be drawn from the fact that the assailant was seen wearing a ski mask, that this ski mask had similarities to the one the witnesses in the bar saw, that it was found on the route described by the accomplice as being the escape route, and that a hair found on this ski mask matched defendant's hair in the necessary microscopic characteristics. While the accomplice's testimony linked both the defendant and the ski mask to the crime, the hair analysis independently linked the defendant to the mask and, therefore, indirectly with the crime. The ski mask as an integral link in the State's case was properly admitted in evidence. Defendant's argument relative to the lack of a proper foundation for the introduction of the ski mask into evidence goes only to the weight of testimony presented in identifying it and not to the admissibility of the ski mask in evidence.

■ The defendant asserts that at the very least the State should have been required to prove that the hair found on the mask was "probably" defendant's. We think this is exactly what the testimony established. Morris Clark, special agent for the Federal Bureau of Investigation, who compared the hair found in the mask with that taken from the defendant, did not say both hairs came from the same man, but he did testify that:

"  *   *   * [M]y examination showed that the hair from both sources exhibited the same microscopic characteristics."

and:

"Well, they were alike in the full range of microscopic characteristics that they exhibited."

From this testimony the jury could conclude that both hairs came from the defendant.

■ The defendant further asserts that the admission of the expert hair testimony was improper "for the reason that the handling of the mask lent itself to contamination and rendered any testimony concerning the hairs found entirely speculative in nature." Also, defendant argues for reversal because the Tucson Crime Laboratory Director testified that he sent two hairs to the F.B.I. expert, while the expert testified that he received three hairs. We think, however, that both of these points go to the weight to be given by the jury to the testimony and not to the admissibility of the evidence.

■ A.R.S. § 13–1424 permits a peace officer to apply to a magistrate for a detention order for identifying physical characteristics. We have recently upheld the constitutionality of that statute. *State v. Grijalva*, 111 Ariz. 476, 478, 533 P.2d 533, 535 (1975). The defendant's constitutional attack on the statute was settled there and need not be repeated here.

Defendant, however, also asserts that the statute was abused because a hair sample was taken pursuant to an order originating in another case. The statute itself answers this argument in that it requires that before an order for detention for a physical examination will issue it must be shown that "[s]uch evidence cannot otherwise be obtained by the investigating officer from either the law enforcement agency employing the affiant or the criminal identification division of the Arizona department of public safety." A.R.S. § 13–1424(A)(3). Since the hair sample was already in the possession of the authorities pursuant to A.R.S. § 13–1424(A)(3), they were obliged to use the sample which they had previously obtained. The defendant's fears that the use of evidence on hand will result in the State abusing the statute by getting the sample in one case when it might really intend to use it in another is not a serious objection to the procedure used. The statute is specific in its requirements regarding its applicability. If a law enforcement agency is successful in obtaining the required order in one case, then the safe-

guards implicit in the statute have operated fully to protect the defendant. We do not think a defendant is prejudiced if the evidence is subsequently used in a different case, since it could be obtained in any event in a second examination.

Defendant urges as reversible error that certain remarks made in the State's closing argument were either (1) improper and inflammatory, calculated to arouse the passion and prejudice of the jury, (2) fundamental error, or (3) that they shifted the burden of proof to defendant, thereby depriving him of a fair trial. We find no merit to any of these complaints.

■ The State's remarks were: (1) the prosecutor's statement that he had three clients in this case, i. e., the three victims; (2) one of the victims "took his last breath lying there in his own beer cans"; (3) the repeated reference to the defense as being "phoney"; (4) the statement that one of the victims, a jockey by profession, had ridden "his last horse", that "winning the big race is no longer a dream", that "Living is no longer a reality because he is dead."; (5) the admonition to the jury not to take out on the victims the fact that the accomplice had been granted immunity, that they should take it out on him [the prosecutor] later; and, finally, (6) a reference to the defense's failure to produce an alibi witness when defense counsel had stated earlier that such a witness would be produced. All of the challenged statements, except the first, were made without objection at the time of their occurrence.

The rule in this jurisdiction is clear:

"Claims of error will not be considered on appeal where the trial court has not been given the opportunity to rule on an issue so as to correct the possible errors." *State v. Coward*, 108 Ariz. 270, 271, 496 P.2d 131, 132 (1972).

Nevertheless, the defendant argues that the statements were calculated to arouse the passion and prejudice of the jury. The general rule for determining whether a closing argument was unduly prejudiced

was stated by this Court in *Sullivan v. State*, 47 Ariz. 224, 55 P.2d 312 (1936):

"The best rule for determining whether remarks made by counsel in criminal cases are so objectionable as to cause a reversal of the case is, Do the remarks call to the attention of the jurors matters which they would not be justified in considering in determining their verdict, and were they, under the circumstances of the particular case, probably influenced by these remarks." 47 Ariz. at 238, 55 P.2d at 317.

We also said in *State v. Gonzales*, 105 Ariz. 434, 466 P.2d 388 (1970):

"Our law permits trial counsel wide latitude in presenting closing arguments to the jury. [Citation omitted] This is because closing arguments are not evidentiary in nature; at such arguments counsel are permitted to comment on the evidence already introduced and to argue reasonable inferences therefrom. [Citation omitted] In the closing argument, excessive and emotional language is the bread and butter weapon of counsel's forensic arsenal, limited by the principle that attorneys are not permitted to introduce or comment upon evidence which has not previously been offered and placed before the jury." 105 Ariz. at 436–437, 466 P.2d at 390–391.

From our examination of the record, we have concluded that the prosecutor's remarks were well within the permissive range of argument. Although the summation had emotional overtones, it did not call to the jurors' attention matters which they were not permitted to consider in the determination of their verdict. Moreover, if we were to conclude that impropriety was present in the closing argument, it was corrected by the judge's instruction to the jurors to consider only testimony and exhibits and not the arguments of counsel. The jurors were also instructed not to be influenced by sympathy or prejudice. We think such instructions sufficiently insulated the defendant from the State's emotional appeals.

The defendant asserts that he was denied the effective assistance of counsel. We have previously said:

"Only when counsel is so inept that the proceedings become a farce or a sham will relief for ineffective counsel be granted." *State v. Bates*, 111 Ariz. 202, 203, 526 P.2d 1054 (1974).

In the instant case, the record discloses that defense counsel vigorously and knowledgably cross-examined the State's witnesses. He submitted requested instructions, made motions for exclusion of evidence and for directed verdicts, and made a credible closing argument. We note defendant does not contend that his counsel failed to consult with him or that he was not advised of his rights. *See State v. Brookshire*, 107 Ariz. 21, 24, 480 P.2d 985, 988 (1971).

■ Defendant asserts prosecutorial misconduct in the failure to disclose to the defense that the prosecution intended to dismiss a bad check charge which had been filed against Pease. The dismissal of the charge would free Pease upon the completion of the homicide trial. It is urged that this information would have had a bearing on Pease's credibility because of the likelihood of having fabricated testimony in order to escape punishment.

A hearing on defendant's motion to vacate judgment was held on December 20, 1974. The motion was heard and denied by the trial judge after the receipt of testimony from Pease's attorney and his law partner, as well as the testimony of the four Assistant Pima County Attorneys involved in the prosecution of the case. The cumulative effect of their testimony was that no deal had been made for Pease's testimony by promises of dismissal of the pending charge.

We have said:

"We have recognized that the state is duty bound to disclose evidence which may be favorable to the defense and which may not be reasonably known to or discoverable by the defense whether or not it is requested." *State v. Salcido*, 109 Ariz. 380, 382, 509 P.2d 1027, 1029 (1973).

The following testimony of Pease's attorney is illustrative of the non-existence of any undisclosed arrangements:

"Q. Have any deals been made with Kenny Pease on the check charge with which he is currently charged with?
A. None.

\*　　\*　　\*　　\*　　\*　　\*

Q. Have I or has anyone else in my office [county attorney's] ever made to you any representations that if Kenny Pease testifies against Mitchell Blazak that we will dismiss his charges?
A. No.
Q. Have I ever represented to you \*　\* that in return for \*　\*　\* Kenny Pease's testimony against Mitchell Blazak that we would reduce his charges?
A. No."

We hold that the defendant was not denied due process in that there was no pre-existing arrangement between the accomplice and the State.

■ Defendant questions the imposition of the death sentence as excessive and unwarranted, arguing that the death sentences should be reduced to life imprisonment for the reason that they are too harsh in light of the evidence and for the further reason that his codefendant was granted immunity from prosecution.

This Court's power to lessen sentences conferred by A.R.S. § 13–1717, "is to be exercised with great caution", *State v. Villa*, 111 Ariz. 371, 372, 530 P.2d 363, 364 (1975). Such is not the case where the death penalty has been imposed. In *State v. Richmond*, 114 Ariz. 186, 560 P.2d 41 (filed December 20, 1976), we pointed out that this Court will make an independent review of the facts to determine for ourselves whether the death penalty was appropriate under the requirements of the statute and the factors established by the evidence. We must be convinced that the statutory aggravating circumstances outweigh the mitigating circumstances.

■ Under certain circumstances the trial court has no discretion in imposing the death sentence. A.R.S. § 13–454, subsec.

D [2] calls for the imposition of the sentence of death whenever it is shown at the sentencing hearing that aggravating circumstances attended the murder and that no mitigating circumstances "sufficiently substantial to call for leniency" exist.[3] We, however, must determine for ourselves if the aggravating circumstances outweigh the mitigating circumstances. From such independent review we are satisfied that the aggravating circumstances were established and that no mitigating circumstances existed, so the death penalty was properly imposed in this case.

█ Defendant argues that A.R.S. § 13–454, as amended, contemplates "a separate offense of 'aggravated' first degree murder which must be separated and specifically charged." We find no merit in this contention. Clearly, the statute merely sets forth guidelines for the determination of punishment after one is convicted of first degree murder. It has nothing to do with the criteria for charging one with the crime of murder.

The defendant argues that the sentences on the attempted murder and attempted armed robbery counts are ambiguous and should be ordered to run concurrently. Since we affirm the sentences of death, we need not decide this contention.

Finally, inasmuch as we recently sustained the constitutionality of A.R.S. § 13–454 in *State v. Richmond, supra,* we find it unnecessary to enter into an in-depth examination of the death penalty.

Judgments affirmed.

CAMERON, C. J., and HAYS, HOLOHAN and GORDON, JJ., concur.

2. "D. In determining whether to impose a sentence of death or life imprisonment without possibility of parole until the defendant has served twenty-five calendar years, the court shall take into account the aggravating and mitigating circumstances enumerated in subsections E and F and *shall impose a sentence of death if the court finds one or more of the aggravating circumstances enumerated in subsection E and that there are no mitigating circumstances sufficiently substantial to call for leniency.*" (Emphasis added)

3. At the conclusion of defendant's hearing on aggravation and mitigation, the court stated:
"THE COURT: Well, then the record may show as the findings required under 13–545.4 [sic] Subsection E1, the Court finds that the defendant has been convicted of another offense which under Arizona Law would be punishable by a life sentence. Those being in Pima County Case No. A15829, Count One robbery, Count Two Assault with intent to commit murder.
As to Item E2, the Court finds the existence of aggravating circumstances in that the defendant was previously convicted of a felony in the United States involving the use of violence or threat of violence on another person, that being the same case referred to under E1.
As to Item E3, the Court finds the existence of aggravating circumstances in that in the commission of this offense for which the defendant is to be sentenced the defendant knowingly created a grave risk of death to other persons in addition to the victims of the offense. In that in addition to the two persons that were killed there was an injury to another patron in the bar. There was risk of injury to several other patrons in the bar.
* * * * * *
As to Item E6, the Court finds existence of aggravating circumstances in that the defendant committed the offense in an especially cruel or deprived [sic] manner, in that under the facts of the case as presented at the trial, although there was non compliance by the bartender with the defendant's attempt to rob him, there was actually no resistance as such by the bartender, or any other people in the bar. And there was no justification in any manner for the action taken which resulted in the killings."