563 P.2d 888

The STATE of Arizona, Appellee,

v.

Wilmar Goodwin HOLSINGER, Appellant.

No. 3402.

Supreme Court of Arizona,
In Banc.

April 14, 1977.

Bruce E. Babbitt, Atty. Gen. by William J. Schafer, III, and Thomas G. Bakker, Asst. Attys. Gen., Phoenix, for appellee.

Flynn, Kimerer, Thinnes & Derrick by Thomas A. Thinnes and Thomas V. Rawles, Phoenix, for appellant.

CAMERON, Chief Justice.

This is an appeal from a jury verdict and judgment of guilt to the crimes of first degree murder, A.R.S. §§ 13–451, –452, –453, with a sentence of death, A.R.S. § 13–453(A); conspiracy, first degree, A.R.S. §§ 13–331(A), with a sentence of 14 to 15 years; burglary, first degree, A.R.S. § 13–301, with a sentence of 14 to 15 years; and conspiracy, second degree, A.R.S. § 13–331(B), with a sentence of 3 to 4 years.

We must answer five questions on appeal:

1. Did the prosecution deliberately use false testimony resulting in prejudicial and reversible error?
2. Was the prosecution's closing argument a comment upon defendant's Fifth Amendment privilege against self-incrimination?
3. Was the failure of the trial court to rule on defendant's motion for judgment of acquittal at the close of the State's case error?
4. Was the prosecution guilty of prosecutorial misconduct which resulted in the denial of a fair trial to the defendant?
5. Is the Arizona death penalty unconstitutional as applied to the defendant in this case?

The facts necessary for a determination of this matter on appeal are as follows. Dr. Harry Schornick, a semi-retired physician, and Golda Horton, defendant Wilmar Goodwin Holsinger's mother-in-law, held a certificate of deposit in the amount of $24,700 in joint tenancy with the right of survivorship. It is the State's theory of the case that this certificate of deposit provided the grounds for a motive in that if Dr. Schornick should die, Golda Horton would then have the money free and clear and conceivably it would then become available to defendant and his wife, Golda Horton's daughter.

In the spring of 1975, the defendant and his wife contacted Gary Cagnina concerning the murder of Dr. Schornick. Cagnina in turn solicited a variety of people including Tim Anderson who, when told of the plans, refused to go along, and William St. Myers who later accompanied Cagnina one evening in an unsuccessful attempt to break into Dr. Schornick's house. Finally, Wade Arnold agreed to accompany Cagnina to the house of Dr. Schornick. Cagnina had a gun provided by the defendant.

After spending several hours trying to enter the house, Cagnina and Arnold finally gained entry in the early morning hours of 1 June 1975. Mrs. Theresa Bortz, Dr. Schornick's housekeeper, was shot and killed and Dr. Schornick was wounded. Early the same morning, Cagnina and Arnold contacted the defendant who paid Cagnina $750 to leave town. Later Cagnina was given defendant's car and some more money. It was defendant's position that this was money for the purchase of drugs for himself and his wife. Cagnina testified that this was payment for the killing.

Cagnina, Anderson, St. Myers, and a Sue Simmons were granted immunity and testified against Holsinger at the trial. The jury returned a verdict of guilty and the trial court, after a hearing in compliance with A.R.S. § 13–454, by special verdict, found the existence of three of the aggravating circumstances outlined in A.R.S. § 13–454(E) and none of the mitigating circumstances as outlined in A.R.S. § 13–

454(F), and sentenced the defendant to death. From the verdicts and judgments of guilt and the sentence of death defendant appeals.

## ANDERSON'S FALSE TESTIMONY

At the time of the preliminary hearing, Tim Anderson was represented by counsel. His attorney obtained immunity for him in exchange for his testimony, as well as an agreement with the County Attorney that he would receive probation for an unrelated charge of possession of heroin.

At the trial, Mr. Anderson testified for and on behalf of the State and on cross-examination the following transpired:

"Q Tell me, are you to receive anything for your testimony here today?

"A No, sir.

"Q Do you have any understanding with the County Attorney's Office with respect to your testimony here today?

"A No, sir.

"Q There is no understanding at all?

"A No, sir.

"Q Are you aware of any type or correspondence having been sent to your attorney, Mr. Arrick, with respect to this case with respect to your testimony?

"A You mean by the County Attorneys and my lawyer?

"Q Yes.

"A No, sir.

"Q Isn't it a fact that you are or there is an agreement entered into between yourself and/or Mr. Arrick and the County Attorney's Office wherein the County Attorney has said they will not prosecute you for anything arising out of your testimony concerning this case; is that your understanding?

"A No, sir, I am not sure what you mean.

"Q Do you have any type of agreement with the County Attorney with respect to this case?

"A No, sir."

Although the attorney who represented the State at the preliminary hearing was assisting the State at the time, the Deputy County Attorney trying the case asked the following questions:

"Q You haven't asked for any deals for your testimony today, have you?

"A No, sir.

"Q And I haven't offered you anything?

"A No, sir."

Since the witness Anderson had been given immunity pursuant to A.R.S. § 13–1804, and since a plea agreement had been entered into whereby the witness Anderson was to be given probation on a heroin charge in return for his testimony, the answers on cross-examination and the questions and answers on redirect were misleading. It is the contention of the defendant that the actions of the County Attorney in standing by and letting a false impression go to the jury constituted misconduct on the part of the County Attorney and was prejudicial.

To test the motives of a witness for testifying by asking questions concerning any benefit he is to receive in return for his testimony is proper on cross-examination. For the State to knowingly conceal this information from the defendant or the trier of fact would be error. We are not pleased with the actions of the State in allowing this false impression to remain with the jury. Any prejudice that might have occurred, however, was certainly corrected during the defendant's case when Anderson's attorney was called and questioned as follows by defendant's attorney:

"Q And did you reach some type of agreement with the County Attorney with respect to Tim Anderson's testimony?

"A To my satisfaction, yes, I believe we did.

"Q Do you recall the agreement?

"A Yes.

"Q What was it?

"A The agreement was that Tim Anderson had testified for a portion of one day previous to this at a preliminary

hearing, and was scheduled to return the following day at the time I became aware of it. And the agreement was that he would come to that hearing the second day, honor the subpoena if in fact he were afforded immunity for this proceeding, the Holsinger matter, and if in fact he were convicted of the matter which I represented him on, the County Attorney's office would not oppose probation because it was a matter that the County Attorney's office usually as a common practice opposes probation on.

"Q Do you recall the nature of the charge that you represented him on?

"A Yes, I do.

"A What is that—what was that?

"A Possession of heroin."

In a similar case where the question was

"Q Have I promised you that I would recommend any reduction of sentence to anybody?

"A You did not."

when the answer was known to be false by the prosecutor, the United States Supreme Court stated:

"*First,* it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. (citations omitted) The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. (citations omitted)

"The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217, 1221 (1959). See also *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

Our case differs from *Napue* and *Giglio, supra,* in that the jury knew that there had been an agreement between Anderson and the State in return for Anderson's testimony. The jury was then in a position to judge Anderson's credibility in the light of this information. We find no prejudice to the defendant.

## COMMENT ON DEFENDANT'S POST–ARREST SILENCE

After the arrest and after the defendant had been informed of his rights, he was asked "Will you voluntarily answer my questions?" Defendant replied "Certainly. I don't have anything to hide." Defendant was shown a photograph of Wade Arnold and Cagnina and denied knowing them. The defendant also denied that he had given his automobile to Cagnina. The defendant was asked on cross-examination:

"Q And then he asked you whether or not you had given your car to Gary Cagnina?

"A Yes, sir.

"Q And what was your response?

"A 'No.'

"Q And in fact, you had given your car to Gary Cagnina?

"A Yes, sir.

"Q So that was a lie, too?

"A I didn't know Gary Cagnina was his name at that time either. I still wasn't aware that was his name until I got in jail.

"Q Well, he showed you the picture of the person you were supposed to have given the car to?

"A He showed me a black and white picture. I don't know which one it was, but I didn't recognize the person in the picture.

"Q He asked you, did he not, if you had ever given a gun to somebody?

"A He might have, I don't really recall.

"Q Let me refresh your recollection, if I can.

Detective Ysasi said,

'Do you remember giving that gun to this young man here?' showing you a photograph.

Your answer:

'I sure don't, I sure wouldn't give a gun to anybody.'

Ysasi:

'You did not give a gun to this man?'

'No siryee.'

'Did you give him any gun?'

'No siryee, if he gets a gun from me, by god he's going to buy it. They buy it at a high price you know, the guns are worth a lot of money now.'

Did you make those responses to those questions?

"A   It seems possible, yes, sir.

"Q   That wasn't true either, was it?

"A   No, sir.

"Q   And so you are now in the police station under arrest being charged with Murder, First Degree, Conspiracy, Assault with a Deadly Weapon, and you don't tell Officer Ysasi about your connection with Gary Cagnina; is that correct?

"A   That's right.

"Q   You couldn't say, 'Look, Officer, I didn't have anything to do with the killing. All I had to do with Gary Cagnina was buy a few drugs from him.' You didn't tell him that?

"A   No, sir."

No objection was made to this line of questioning.

During closing argument by the State, the following comment was made:

"A story to Ysasi—well, you know, Mr. Martin can say anything he wants. But if I am charged with the murder of Dr. Schornick, I would say, 'Hey, wait a minute, fellows, okay. The jig is up. You know, I knew these guys, the guys that you showed me in the picture. And I was dealing drugs, but I didn't kill Schornick. He was one of my best friends."

█   It is defendant's position that these questions violated defendant's right to remain silent, contrary to State and federal cases. *State v. Anderson,* 110 Ariz. 238, 517 P.2d 508 (1973); *State v. Rhodes,* 110 Ariz. 237, 517 P.2d 507 (1973). We agree with the statement of the Tenth Circuit:

"As the trial court properly found in the instant case, silence at the time of arrest is not an inconsistent or contradictory statement. Silence at the time of arrest is simply the exercise of a constitutional right that all persons must enjoy without qualification. (citations omitted) It would indeed be irregular and anomalous to warn an accused that he has the right to remain silent, that if he says anything it may be used against him, however, if he does remain silent that too may be used against him. (citations omitted) This would be the practical effect of allowing the prosecution to use at trial the fact that an accused remained silent, clearly making the assertion of the constitutional right costly." *Johnson v. Patterson,* 475 F.2d 1066, 1068 (10th Cir. 1973).

█   We do not agree, however, that the instant matter is controlled by these cases. Had the defendant, after being given his *Miranda* warnings, indicated that he didn't wish to talk, it would have been error to comment on that, and if, at anytime during the conversation had the defendant decided to stop talking and so informed the officers, it would have been improper to comment upon his decision not to, at that point, answer further. Here, however, the defendant had voluntarily made express falsehoods to the police. The County Attorney properly brought this information to the jury and by questioning and argument commented on the fact that the defendant told one story to the police officers and another on the witness stand. As to the closing argument we have stated:

"The best rule for determining whether remarks made by counsel in criminal cases are so objectionable as to cause a reversal of the case is, Do the remarks call to the attention of the jurors matters which they would not be justified in considering in determining their verdict, and were they, under the circumstances of the particular case, probably influenced by these remarks." *Sullivan v. State,* 47 Ariz. 224, 238, 55 P.2d 312, 317 (1936). See also *State v. Blazak,* 114 Ariz. 199, 560 P.2d 54, 59 (1977).

The prosecution merely suggested that he could have told the truth rather than lying. Holsinger having lied, than later admitting he lied, the prosecutor could properly ask why he didn't tell the truth in the first place. We find no error.

## FAILURE TO RULE AT THE CLOSE OF THE STATE'S CASE

At the end of the State's case, the defendant moved for a judgment of acquittal. Rule 20 of the Rules of Criminal Procedure (1973) reads as follows:

"a. *Before Verdict.* On motion of a defendant or on its own initiative, the court shall enter a judgment of acquittal of one or more offenses charged in an indictment, information or complaint after the evidence on either side is closed, if there is no substantial evidence to warrant a conviction. The court's decision on a defendant's motion shall not be reserved, but shall be made with all possible speed."

The court did not rule promptly, but, in effect, reserved the motion until the conclusion of the case. This action by the court was contrary to Rule 20(a), Arizona Rules of Criminal Procedure (1973). For the purpose of this appeal, we will consider the motion as having been denied and look to see if there was error in not having granted the motion when made by the defendant at the end of the State's case.

Defendant contends that the only evidence connecting him with the crime came from testimony of accomplices. The statute in effect at the time, A.R.S. § 13–136, read:

"A conviction shall not be had on the testimony of an accomplice unless the accomplice is corroborated by other evidence which, in itself and without aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

In the instant case, the testimony of the accomplices, Cagnina and St. Myers, tied defendant to the crime and other testimony showed only that a crime had been committed. If this were all the testimony, we would have to agree with the defendant. We believe that there was sufficient corroborating testimony to satisfy the statute.

Corroborating evidence is sufficient if it tends to implicate the defendant to only a slight degree. *State v. Beard,* 107 Ariz. 388, 489 P.2d 25 (1971). It need not directly connect the defendant with the crime, it need only tend to do so. *State v. Canada,* 107 Ariz. 66, 481 P.2d 859, cert. denied 404 U.S. 848, 92 S.Ct. 154, 30 L.Ed.2d 87 (1971). The facts in each case must control. *State v. Crawford,* 106 Ariz. 322, 475 P.2d 936 (1970).

Tim Anderson testified that he and Cagnina went to defendant's residence and that after talking about chemistry:

"Q Did the conversation, Gary, (sic) after awhile center around the possibility of killing someone?

"A Yes, sir.

"Q Would you tell the jury what that conversation consisted of?

"A Well, that Mr. Holsinger said, you know, he just told us that he wanted this old doctor knocked off. And he said that—you know—he told us a couple ways, and one of these ways was poisoning—or Gary suggested that, and then Mr. Holsinger said that you couldn't do that, because that would point directly to him being a chemist. And then he said that these people get up, you know, another way would be these people get up early every morning regularly to eat breakfast early. And then we would just wait for them to get up.

"Q And then do what?

"A And then shoot them.

"Q What else was said, if you recall?

"A He told us how to muffle the gun.

"Q Did he bring some guns out and show you some guns?

"A    Yes, sir."

And:

"Q    After you fired the weapon, did you have any further discussion with the Defendant and Gary Cagnina reference knocking somebody off?

"A    Well, since that one lawn-mower muffler didn't work, he suggested that we use some chamois to muffle the sound, sheepskin clothes, to be exact.

"Q    Anything else?

"A    Not that I recall.

"Q    All right.  Tim, did you then leave the residence shortly thereafter?

"A    Yes, sir.

"Q    Did you indicate to Gary Cagnina whether or not you were going to participate in this?

"A    Oh, yes, sir.

"Q    What did you say?

"A    'No.' "

■ Tim Anderson was not an accomplice.  He had been asked to participate and he had refused to do so.  Tim Anderson provided the corroborating evidence needed to allow the matter to go to the jury.  We find no error.

### PROSECUTORIAL MISCONDUCT

■ Defendant contends that the trial court was prejudiced by several instances of prosecutorial misconduct which so affected the jury and the trial process that a fair trial was impossible.

Defendant first complains of the prosecutor's attack of his own witness in closing argument:

"Cagnina, I despise the man.  I despise everything he stands for.  He's a doper.  He's a dope pusher.  He's a thief.  He's a burglar.  He's a murderer.  I despise him so much that I couldn't even question him in his testimony."

And:

"But you listened to the testimony of Cagnina.  And even in Cagnina's lies, even in Cagnina's lies, he convicts that man.

\*      \*      \*      \*      \*      \*

"And then Cagnina's story falls apart, because Cagnina sits up there and tells you that they went to the Schornick residence June 1st, 1975, to burglarize the residence, that he was really an unwilling participant in a burglary, that Wade Arnold was the only one that really wanted to do the job, that he just kind of followed along, followed in the footsteps of Wade Arnold.  Is he kidding us?  He was there and Wade Arnold was there on the 1st of June to kill, and there can't be any doubt in anybody's mind but that's the case."

Cagnina was the State's main witness; Cagnina was neither the best of witnesses nor the most appealing.  In a criminal trial, both the State and the defendant are frequently faced with the necessity of using key witnesses whose character and credibility leave much to be desired.  Because a witness is called by a party means only that the witness has certain testimony that the calling party believes to be true and will aid the trier of fact in reaching a decision.  The person calling the witness does not vouch as to the witness's good moral character or even that all of his testimony, particularly on cross-examination, will be true.

Under the circumstances, we believe that the remarks of the prosecutor were fair comment upon Cagnina's testimony.

■ Defendant next contends the State erred in not informing the defendant that Sue Simmons, a State's witness, was granted immunity in return for her testimony.  Defendant contends that this is *Brady* material and we agree that the fact that a State's witness has been given immunity is information useful to the defendant in cross-examining that witness.  We do not, however, have to consider that contention as the County Attorney's file, which was made available to the defendant prior to trial, contained a letter stating that the police would bring no charges against Miss Simmons.  There was no attempt to hide this information from the defendant and the fact of the grant of immunity was available to the defendant with only slight diligence.  We find no error.

Our decision in the instant matter can be distinguished from the companion case of Jeannie Louise Holsinger filed this day in which we reversed and remanded for new trial based upon the failure of the prosecutor to inform the defendant of the grant of immunity to Sue Simmons in Jeannie Louise Holsinger's separate trial.

In Jeannie Louise Holsinger's trial, Sue Simmons' testimony was vital. In this case, Sue Simmons' testimony was not vital. There is, as defendant admits, a "logical inconsistency" in the brief in that here the defendant must show that Sue Simmons' testimony was material and previously in the brief, when considering the failure to rule on defendant's motion for judgment of acquittal, the defendant characterized Sue Simmons' testimony as "totally innocent in nature." We agree that the testimony (covering only 10 pages of the transcript) was not material as to the defendant Wilmar Holsinger. Denial of a *Brady* right is not prejudicial unless material:

> "We do not, however, automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . .' *United States v. Keogh*, 391 F.2d 138, 148 (CA 2 1968)." *Giglio v. United States, supra*, 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108.

Defendant further questions the tactics of the prosecution in suggesting that Anderson's probation on the heroin charge was routine and not something out of the ordinary. On cross-examination of Anderson's attorney by the State, the prosecutor asked the following questions:

> "Q (By Mr. Mount) At any rate, you were offered a recommendation of probation to the possession of heroin, and that was no big deal. That's what they usually get anyhow, is that right?
>
> "A No, that's not right.
>
> "Q They don't usually get probation on possession of narcotic drug?
>
> "A It's not my understanding when it's alleged that there were 33 balloons.

> "Q Now, the case was dismissed not at the request of the County Attorney's Office, was it?
>
> "A No, it was dismissed at my request.
>
> "Q Because the witness did not show up?
>
> "A That's correct."

We would hope that 33 balloons of heroin does not normally result in probation. We feel, however, that the matter has been correctly and completely presented to the jury. We find no prejudice.

## IMPOSITION OF THE DEATH PENALTY

The Arizona death penalty statute has been previously upheld by this court. *State v. Jordan*, 114 Ariz. 452, 561 P.2d 1224, filed December 30, 1976; *State v. Knapp*, 114 Ariz. 531, 562 P.2d 704, filed March 9, 1977; *State v. Richmond*, 114 Ariz. 186, 560 P.2d 41 (1976); *State v. Blazak*, 114 Ariz. 199, 560 P.2d 54 (1977).

Our statute requires that after a verdict of murder in the first degree, the trial court must hold a "separate sentencing hearing" to determine whether to impose the death penalty or life imprisonment, and the trial court is required to return a special verdict with findings pursuant to statute. The trial court is given specific guidance in what he must find in the way of aggravating and mitigating circumstances and less in the way of judicial discretion. The statute complies with the requirements of the United State Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Section D of A.R.S. § 13–454 reads as follows:

> "In determining whether to impose a sentence of death or life imprisonment without possibility of parole until the defendant has served twenty-five calendar years, the court shall take into account the aggravating and mitigating circumstances enumerated in subsections E and F and shall impose a sentence of death if the court finds one or more of the aggravating circumstances enumerated in sub-

section E and that there are no mitigating circumstances sufficiently substantial to call for leniency."

■■■ The trial judge found the following aggravating circumstances pursuant to subsection E of A.R.S. § 13-454:

"3. In the commission of the offense the defendant knowingly created a grave risk of death to another person or persons in addition to the victim of the offense.

"4. The defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value.

"5. The defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value."

The record supports the trial court's finding of these three aggravating factors.

The mitigating circumstances contained in subsection F read as follows:

"F. Mitigating circumstances shall be the following:

1. His capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution.

2. He was under unusual and substantial duress, although not such as to constitute a defense to prosecution.

3. He was a principal, under § 13-452, Arizona Revised Statutes, in the offense, which was committed by another, but his participation was relatively minor, although not so minor as to constitute a defense to prosecution.

4. He could not reasonably have foreseen that his conduct in the course of the commission of the offense for which he was convicted would cause, or would create a grave risk of causing, death to another person."

The trial court found none of these mitigating circumstances and upon review of the record we find none.

■■■ The defendant contends, however, because the codefendant, Jeannie Louise Holsinger, the wife of the defendant, received life while the defendant received death for the same crime, that he is being denied equal protection of the law. We do not agree. The appeal of the wife is before this court and our decision in that case has been handed down this day. We have taken judicial notice of the wife's file and we have considered the entire record in that file in deciding defendant's question on appeal.

It is true that the wife was convicted of first degree murder of the same person as the defendant. However, the trial court found in the wife's case a mitigating circumstance not found in the defendant's case. The minute entry in the case of Jeannie Louise Holsinger reads as follows:

"No legal cause appearing to the Court why Sentence should not now be pronounced, and the Court by its Special Verdict filed herein having concluded that there is one of the aggravating circumstances innumerated (sic) in Subsection E of the Arizona Revised Statutes, Section 13-454; specifically that in the commission of the offense the defendant knowingly created a grave risk of death to another person or persons in addition to the victim of the offense; and the Court further having found the existence of one of the mitigating circumstances innumerated (sic) in Subsection F of the Arizona Revised Statutes, that, although a principle in the crime charged, the Defendant's participation was relatively minor when compared to that of her husband, Wilmar Goodwin Holsinger; specifically it was Wilmar Goodwin Holsinger, not the defendant, who had the first personal contact with Gary Cagnina, one of the two individuals who were hired to murder Dr. Harry Schornick. It was Wilmar Goodwin Holsinger, not the defendant, who told Gary Cagnina '. . . there was somebody he wanted disposed of because he had been causing him trouble.' It was Wilmar Goodwin Holsinger, not the defendant, who expressed a motive for the crime to Gary Cagnina. It was Wilmar Goodwin Holsinger, not the Defendant who advised and counseled as

to the manner in which the crime was to be committed and who first displayed and thereafter furnished the murder weapon, declaring the same to be untraceable because not registered. It was Wilmar Goodwin Holsinger, not the defendant, who advised Gary Cagnina that whoever accomplished the crime would receive something of value for committing the crime. It was Wilmar Goodwin Holsinger, not the defendant, who suggested that Gary Cagnina and others engage in additional criminal conduct; specifically, suggesting the burglary of a drugstore. It was Wilmar Goodwin Holsinger, not the defendant, who developed the relationship with Gary Cagnina and James Wade Arnold by taking them to his chemical laboratory and while there giving unlawful drugs to both Cagnina and Arnold. Finally, it was Wilmar Goodwin Holsinger, not the defendant, who gave $750.00 in cash to Wade Arnold when he and Gary Cagnina came to the Holsinger residence on the evening of the murder. * * *"

It is noted that the same judge tried and sentenced both defendants. We have reviewed the record in both cases and we believe there are sufficient differences between the facts in defendant's case and that of his wife to justify the imposition of a sentence of death for the defendant and life for the wife.

Judgment and sentence affirmed.

STRUCKMEYER, V. C. J., and HAYS, HOLOHAN and GORDON, JJ., concurring.