SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-07-0103-AP |
| Appellee, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) No. CR2002-010926 |
| PAUL BRADLEY SPEER, | ) |
| | ) |
| Appellant. | ) |
| | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Andrew G. Klein, Judge

**AFFIRMED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                      Phoenix
     By   Kent E. Cattani, Chief Counsel
          Capital Litigation Section
          John Pressley Todd, Assistant Attorney General
Attorneys for State of Arizona

DROBAN & COMPANY, P.C.                                        Anthem
     By   Kerrie M. Droban
Attorneys for Paul Bradley Speer
_____

**H U R W I T Z**, Vice Chief Justice

¶1      Paul Bradley Speer was convicted of first degree murder and sentenced to death.  This is an automatic appeal pursuant to Arizona Rule of Criminal Procedure 31.2.  This Court has jurisdiction under Article 6, Section 5(3) of the Arizona Constitution, and A.R.S. §§ 13-755, 13-4031, and 13-4033 (2001 & Supp. 2008).

# I.

## Background Facts and Proceedings Below

### A.

### The Burglary

¶2       On March 14, 2002, Speer and his half-brother Chris Womble broke into an apartment on West Glenrosa Avenue in Phoenix.[1]  Adan and Enriqueta Soto lived there with their three children.   No one was at home during the break-in, but a neighbor saw two men trying to open an apartment window and called the police.

¶3       Shortly after the neighbor's call, two men were seen walking toward a nearby apartment complex.  Residents of that complex directed police to the apartment of Sabrina and Bill Womble, Speer's mother and stepfather.  Speer was found beneath a couch; Chris was found in a closet.  After the two were arrested, the officers searched the apartment and found items belonging to the Sotos.

### B.

### The Plot

¶4       Speer was held at the Madison Street jail and made telephone calls to family and friends while in custody.  The

---

[1]     We view the facts in the light most favorable to sustaining the jury's guilty verdict.  *See State v. Garza*, 216 Ariz. 56, 61 n.1, 163 P.3d 1006, 1011 n.1 (2007).

Maricopa County Sheriff's Office ("MCSO") recorded outgoing prisoner phone calls. Most of Speer's calls were to Al Heitzman, with whom Speer's half-brother Brian Womble lived. Al or Brian would occasionally then make three-way calls to others.

¶5 On March 18, Speer asked Al to post his $7,000 bond, stating that he could not win his case unless he could talk to the victims and convince them not to testify. On April 28, Speer told Al about a plea offer of 6.5 to 13 years imprisonment. Al connected Bill Womble to the call; Speer asked if Bill's brother would be willing to post bond.

¶6 Speer called again on April 29, asking Brian to sell his two handguns to raise the bond money. Brian responded that he needed the guns to commit suicide. Speer said that Brian's problems were minor compared to Speer's. Speer also said that instead of accepting a plea offer he wanted to convince the witnesses not to testify.

¶7 After Brian said he did not have the money for bond, Speer asked, do "you think you can . . . handle some shit for me?" Brian responded that he "probably could" but "if I do that, I'll be dead too." Speer suggested that Brian offer the victims his .357 handgun as an inducement to not testify. Speer called again and told Brian that if the witnesses testified, he would get the maximum sentence.

3

¶8 On April 30, Brian told Speer that he would retrieve his guns from Al's safe deposit box. Speer told Brian to tell the victims that Speer was not involved. Brian said that he instead would employ "Plan B." Brian later asked Speer if he should talk to the victims or do his other plan. Answering his own question, Brian said he was going to do his other plan. Speer replied, "Okay. Yeah, yeah. Go ahead."

¶9 On May 5, Speer spoke with Brian and Al at length. Initially, Speer tried to pressure Al into posting the bond money by warning that Brian might do something violent. Al, however, refused, and Speer replied that he and Brian would have "to go to Plan B."

¶10 On May 13, Speer called Brian to talk about "Plan B" and told him to "make sure you take care of everybody in that house. . . . there's only like two." Brian said he needed a silencer. Speer reiterated that Brian could do the job alone, as there were only "two people in there." Speer again reminded Brian that "everything in there has to go."

¶11 On May 17, Brian proposed that he break into the apartment and wait for the Sotos to come home. Speer suggested instead that Brian pose as a police officer who needed to take photos for the upcoming trial. Brian again told Speer that he had retrieved his guns; Speer said, "make sure you talk to both

people." Brian said that he had been to the complex and staked it out. Speer said, "Handle business fool, alright?"

¶12     On May 19, Speer called Brian again. They referred to a "surprise birthday party," and Speer said it would be a waste of a party if Brian did not get both people. Brian told Speer that he now had a silencer and described the effect his gun would have on the Sotos.

¶13     On May 24, Al told Speer that Brian was severely depressed. Speer then asked Brian, "Is it pretty sure you're going to . . . you'll be able to get it running tonight?" Speer also told him to make sure to throw away the evidence. Speer again asked Brian, "I don't have nothing to worry about, about you getting the car together, right?"

¶14     Speer and Brian then called Bill Womble and asked if anyone had talked to Sabrina about the burglary trial. Speer reiterated to Bill that Sabrina was on medication at the time and therefore should not remember anything. Speer later asked Brian whether the "car window" was down when he checked it. Brian replied that "there's always a . . . way for . . . water to squeeze in." Speer urged that the plan be executed that night.

## C.

### The Murder

¶15     On May 25, 2002, at 3:00 a.m., the Sotos returned home from a party.  At approximately 5:00 a.m., Enriqueta placed a 911 call.  When EMTs arrived, they found Enriqueta on the living room couch; she had been shot, but her wounds were not fatal.  An EMT found Adan lying in bed with his arm around an infant.  Adan was dead from a gunshot wound; the infant was unharmed.

¶16     When police arrived, they found the screen for the front window to the apartment removed.  Brian's palm prints were later identified on the screen.

## D.

### The Aftermath

¶17     On the day after the murder, Speer called Brian and asked him if he got "the car running" and fixed "both parts." Brian said, "Yep, perfect."  Speer told Brian that he should leave for Nevada and that he needed to "get rid of those [engine parts] cause I don't want the . . . grease getting all over . . . my room."  Speer and Brian called Bill; Speer told Bill that he could be out of jail in four months and that Bill had raised some "rioters."

¶18     Speer called Sabrina the next day.  Speer told her that anything Brian had said was the result of drugs.  Sabrina said that the Sotos had been murdered.  Speer tried to quiet her

6

and told her that if she had to testify she should say that she was on pills at the time of the arrest and remembered nothing.

¶19     On June 10, Speer called Brian.  Brian said that one of the Sotos was still alive, but Speer said that he was not worried.  On June 19, Speer sent a letter to Brian reminding him to get rid of the "engine parts" and his shoes.  When police later searched Brian's bedroom, they found the letter and a book on silencers.

## E.

## Proceedings Below

¶20     A grand jury indicted Speer for six felonies, including first-degree murder, in connection with the events of May 25.  The State filed a timely notice of intent to seek the death penalty, alleging four aggravating factors:  Speer was previously convicted of a serious offense (armed robbery), A.R.S. § 13-751(F)(2) (Supp. 2008);[2] in the commission of the offense, Speer knowingly created a grave risk of death to the Sotos' infant, A.R.S. § 13-751(F)(3); the murder was committed in a heinous or depraved manner (witness elimination), A.R.S. § 13-751(F)(6); and Speer committed the murder while in custody, A.R.S. § 13-751(F)(7).

---

[2]     At the time of the murder, aggravating circumstances were described in A.R.S. § 13-703(G) (Supp. 2001); the relevant statute is now § 13-751(F).  Because the two statutes do not differ in any respect material to this appeal, this opinion cites to § 13-751.

¶21     In January, 2007, the jury returned guilty verdicts on all six counts related to the May 25 shooting, as well as on two counts related to the March 14 burglary.  The jury subsequently found all four aggravators proved beyond a reasonable doubt and then determined that Speer should receive a death sentence for Adan's murder.

## II.

### Jury Selection and Guilt Phase

¶22     Speer raises seven issues on appeal.[3]  Two are related to jury selection, two to the guilt phase of the trial, one to the aggravation phase, and two to the penalty phase.[4]

### A.

### Jury Selection

### 1.

¶23     Speer first argues that the superior court erred in refusing to excuse certain jurors for cause.  "A defendant is entitled to 'a fair trial by a panel of impartial, indifferent jurors.'"  *State v. Velazquez*, 216 Ariz. 300, 306-07 ¶ 18, 166 P.3d 91, 97-98 (2007) (quoting *Morgan v. Illinois*, 504 U.S. 719, 727 (1992)).  "'A juror who will automatically vote for the

---

[3]     Speer also raises twelve claims about the death penalty in order to preserve them for federal review.  These claims, and citations to cases that Speer acknowledges have rejected his arguments, are set out verbatim in the Appendix.

[4]     Speer does not challenge his conviction or sentence for any crime other than first degree murder.

8

death penalty without considering the presence of mitigating circumstances will not meet this threshold requirement of impartiality.'" *Id.* (quoting *Morgan*, 504 U.S. at 729). However, a court should not strike a juror "willing to put aside his opinions and base his decisions solely upon the evidence." *Id.* at 307 ¶ 19, 166 P.3d at 98 (citations and internal quotation marks omitted). Refusal to strike a juror for cause is reviewed for abuse of discretion. *State v. Cruz*, 218 Ariz. 149, 158 ¶ 28, 181 P.3d 196, 205 (2008).

¶24    Speer contends that seven potential jurors should have been excused for cause. The defense, however, used peremptory challenges to remove all but one of these jurors. "Even if a defendant is forced to use a peremptory challenge to remove a juror who should have been excused for cause, . . . an otherwise valid criminal conviction will not be reversed unless prejudice is shown." *Id.* (citing *State v. Hickman*, 205 Ariz. 192, 196-97 ¶¶ 20-21, 68 P.3d 418, 422-23 (2003)). We thus need consider only the single juror who served on the trial jury, Juror 29.

¶25    Juror 29 selected the following statement in the jury questionnaire as most closely representing his views: "I feel the death penalty should be imposed in all cases as long as the State proves beyond a reasonable doubt that a person killed another human being with premeditation." He underlined "beyond a reasonable doubt." In the same questionnaire, the juror wrote

that "when I was younger, I felt an eye for an eye," but now "I want to know why before I decide." During voir dire, he agreed that he "might not . . . vote to impose death" if a person "had a pretty tough upbringing" or "mental health problems," stating, "I need to hear everything before I decide." Given Juror 29's statements, the trial court's refusal to strike him for cause was not an abuse of discretion.

**2.**

¶26 The trial court excused Jurors 136, 250, and 427 for cause over defense objections. Speer argues that all were improperly struck. "Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant is entitled to an impartial jury." *Velazquez*, 216 Ariz. at 306 ¶ 14, 166 P.3d at 97. Jurors cannot be dismissed for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968) (finding Sixth Amendment violation); *see also State v. Anderson* (*Anderson I*), 197 Ariz. 314, 324 ¶ 23 & n.5, 4 P.3d 369, 379 & n.5 (2000) (finding violation of Ariz. R. Crim. P. 18.5(b) when jurors dismissed without opportunity for rehabilitation on voir dire). A juror may be removed for cause, however, if his views on the death penalty "would 'prevent or substantially impair the performance of his duties as a juror in

accordance with his instructions and oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)); *accord Anderson I*, 197 Ariz. at 318-19 ¶ 9, 4 P.3d at 373-74. "[J]urors who state unequivocally that they could never impose the death penalty regardless of the facts of the particular case" are therefore properly removed. *Anderson I*, 197 Ariz. at 318 ¶ 7, 4 P.3d at 373 (citing *Witherspoon*, 391 U.S. at 514). We review the strike of a potential juror for abuse of discretion. *Velazquez*, 216 Ariz. at 306 ¶ 13, 166 P.3d at 97.

¶27 On voir dire, Juror 136 said "I'm not quite sure . . . if I will be able to do a death sentence." The juror then said that "it's not that I'm against it, it's just that I don't know if I would be able to put someone else's life in my hands beyond a reasonable doubt." On examination by defense counsel, the juror reiterated that "my problem . . . is . . . beyond a shadow of a doubt. Okay. Can you prove to me beyond a shadow of a doubt enough for me to accept that this crime happened?" The juror then stated, "I could listen to the evidence, but can I say that he is guilty and his life should be taken? No, I can't do that." Given these statements, the trial court did not abuse its discretion in granting the State's motion to strike.

¶28 Juror 250 indicated on the questionnaire that imposing the death penalty "would be very scary for me." Although

initially suggesting on voir dire that she might be able to impose death, when asked by the court for a definitive answer, the juror said, "I guess I'd have to say I don't think I can vote for the death penalty." In light of this response, the court did not abuse its discretion in excluding this juror.

¶29 Juror 427 initially indicated that, although uncomfortable with the death penalty, she would follow the judge's instructions. However, the juror later stated, "I don't know that I'm capable of it." On further questioning by the State, the juror responded affirmatively to the question of whether "your ability to be fair and impartial is substantially impaired by your not knowing whether you could actually vote for the death penalty." The court later asked the same question, and the juror responded, "From where I sit right now, I believe it could be an impairment. I believe the fact that I don't wish to be responsible for that may sway me." Given these statements, the court did not abuse its discretion in striking the juror.

**B.**

**Guilt Phase**

**1.**

**Spoliation of Evidence**

¶30 MCSO contracted with Tenetix, Inc. for its jail phone call recording system. MCSO kept the recordings on digital

12

cassette tapes. After being stored for six months, tapes were reused and the old data recorded over. Tenetix kept a database with information about prisoner calls. A recording could be located by sending search criteria to Tenetix, which would generate a list of matches, indicating the cassette containing each call. Either law enforcement or a defendant could request that a cassette be "tagged," in which event the tape was not recorded over.

¶31    In June 2002, Phoenix police detectives obtained a court order to listen to calls from Speer to Al Heitzman. The detectives did not listen to every call that came up as a result of Tenetix's search and did not preserve some calls to which they listened. The detectives both tagged and copied onto separate cassette tapes twenty-seven calls that they deemed relevant to their murder investigation.

¶32    Brian Womble's attorney later filed a standard discovery motion, requesting "[a]ll statements of the defendant and anyone who will be tried with defendant." In response, the State produced the twenty-seven recordings.[5] The discovery request was made within six months of the date of the phone calls. When the request was made, Speer's attorney knew that MCSO policy was to reuse cassettes after six months.

---

[5]    Speer and Brian Womble were both charged with the murder. Their trials were severed after the State responded to the discovery motion.

13

¶33     Nine recordings listed in the Tenetix search were not copied or tagged by the detectives and were thus destroyed when MCSO reused the tapes.  Speer moved to suppress the twenty-seven preserved recordings.

¶34     The superior court held an evidentiary hearing.  One of the police detectives testified that he knew that any call having to do with the murder had to be preserved whether it helped the defense or the prosecution and that "anything about the homicide would have been preserved."  The court denied the motion to suppress, finding that Speer had made no showing that the unpreserved conversations contained relevant or exculpatory information.  The court also found no bad faith by the State.

¶35     Speer later requested the following jury instruction, pursuant to *State v. Willits*, 96 Ariz. 184, 393 P.3d 274 (1964):

> If you find that the state lost, destroyed, or failed to preserve evidence whose contents or quality are important to the issues in this case, then you should weigh the explanation, if any, given for the loss or unavailability of the evidence.  If you find that any such explanation is inadequate, then you may draw an inference unfavorable to the state, which itself may create a reasonable doubt as to the defendant's guilt.

The superior court denied the instruction but ruled that Speer could argue to the jury that the State had failed to preserve relevant evidence.

14

**a.**

¶36     Speer contends that the trial court erred in denying his motion to suppress the twenty-seven recordings.  We review a decision whether to suppress evidence for an abuse of discretion.  *State v. Dean*, 206 Ariz. 158, 161 ¶ 9, 76 P.3d 429 (2003).  "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).  The test under the Arizona Constitution is the same.  *State v. Youngblood*, 173 Ariz. 502, 508, 844 P.2d 1152, 1158 (1993).

¶37     The critical distinction for constitutional purposes is "between 'material exculpatory' evidence and 'potentially useful' evidence."  *Illinois v. Fisher*, 540 U.S. 544, 549 (2004) (per curiam); *see also State v. O'Dell*, 202 Ariz. 453, 458 ¶ 13, 46 P.3d 1074, 1079 (App. 2002) (stating that the mere possibility that destroyed evidence might be exculpatory does not establish a constitutional violation).  *Youngblood* held that "[t]he presence or absence of bad faith for purposes of the due process clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."  488 U.S. at 56 n*.  The Supreme Court had previously explained that the Due Process Clause is violated

only when the exculpatory value of evidence is apparent. *California v. Trombetta*, 467 U.S. 479, 489 (1984).

¶38      Under the case law, the trial court did not abuse its discretion in denying Speer's motion to suppress. Speer did not establish that the destroyed tapes contained material exculpatory evidence or that the police acted in bad faith. *See State v. Bocharski* (*Bocharski I*), 200 Ariz. 50, 59 ¶ 43, 22 P.3d 43, 52 (2001) (stating that destruction of evidence was not a violation of due process when "the defendant fails to provide even a hint of what exculpatory evidence there might have been").

**b.**

¶39      Speer also contends that the trial court erred in denying the *Willits* instruction. We review that decision for abuse of discretion. *State v. Bocharski* (*Bocharski II*), 218 Ariz. 476, 486–87 ¶ 42, 189 P.3d 403, 413–14 (2008).

¶40      To receive a *Willits* instruction, the "defendant must show (1) that the state failed to preserve material and reasonably accessible evidence having a tendency to exonerate him, and (2) that this failure resulted in prejudice." *State v. Murray*, 184 Ariz. 9, 33, 906 P.2d 542, 566 (1995); *accord State v. Smith*, 158 Ariz. 222, 227, 762 P.2d 509, 514 (1988). "A trial court does not abuse its discretion by denying a request for a *Willits* instruction when a defendant fails to establish

16

that the lost evidence would have had a tendency to exonerate him." *State v. Fulminante*, 193 Ariz. 485, 503 ¶ 62, 975 P.2d 75, 93 (1999).

¶41 The superior court did not abuse its discretion here. The police detective testified that he preserved any conversations relevant to the homicide investigation. Speer did not demonstrate that the erased tapes might have exonerated him or even mitigated his participation in the murder plot. Indeed, because the nine calls at issue occurred after the first preserved call, and incriminating calls continued up to and after the murder, there is no logical inference that these nine had a tendency to exonerate.

## 2.

### Prosecutorial Misconduct

¶42 Speer next contends that the trial court erred in refusing to declare a mistrial for prosecutorial misconduct. "Because the trial court is in the best position to determine the effect of a prosecutor's [actions]," we review for an abuse of discretion. *State v. Newell*, 212 Ariz. 389, 402 ¶ 61, 132 P.3d 833, 846 (2006). When a timely objection is made, reversal is warranted if "a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying the defendant a fair trial." *State v. Anderson* (*Anderson II*), 210 Ariz. 327, 340-41 ¶ 45, 111 P.3d 369, 382-83

17

(2005) (citation omitted).  Absent objection, however, review is only for fundamental error.  *State v. Morris*, 215 Ariz. 324, 335 ¶ 47, 160 P.3d 203, 214 (2007).

**a.**

**¶43**     Only one incident cited by Speer involves inappropriate conduct.  Outside the presence of the judge and jury but in earshot of Speer, the prosecutor told a female defense attorney to be careful about contracting gonorrhea from Speer.  The defense moved that the prosecutor be removed.  After the prosecutor claimed that she did not mean offense by the statement, but was expressing genuine concern regarding communicable diseases, the trial court denied the motion.

**¶44**     Whatever her motivations, the prosecutor's statement was entirely unprofessional.  Speer has not demonstrated, however, that this isolated instance of misconduct outside the presence of the jury deprived him of a fair trial.  *See State v. Armstrong*, 208 Ariz. 345, 357-58 ¶¶ 60-64, 93 P.2d 1061, 1073-74 (2004) (noting that without more, acrimonious and inappropriate remarks outside the presence of the jury do not warrant reversal).

**b.**

**¶45**     Speer also alleges that two instances of misconduct occurred in front of the jury.  The first involved the questioning of a detective who listened to the jail tapes; the

prosecutor asked him if Speer's attorney knew that recordings were destroyed after six months.  After the court rejected a defense objection, the detective testified that the attorney was aware.  Defense counsel then moved for a mistrial, arguing the State had improperly shifted the burden of proof through the question.  The trial court denied the motion, but instructed the jury that the burden of proving guilt beyond a reasonable doubt never shifts.

¶46    The trial court did not err in denying a mistrial. The prosecutor never suggested that the defense had the burden of proving Speer's innocence.  Rather, the questioning appeared designed to rebut any contention of bad faith on the part of the police, by suggesting that both the State and the defense had a chance to preserve the nine calls but failed to do so.  In any event, any conceivable prejudice was cured by the instruction.

¶47    The second incident occurred during the guilt phase closing argument.  The prosecutor stated the State had the burden "in this phase" of proof beyond a reasonable doubt. Speer moved for a mistrial, contending that this statement improperly implied that there necessarily would be future phases.  As the trial judge correctly found in denying the motion, the prosecutor was talking about the particular phase only to emphasize that Speer did not have the burden of production.  Indeed, the judge noted the various times that

19

defense counsel, the prosecutor, and the court itself had previously made plain to the jury that the trial could involve three phases.

### c.

¶48     Speer also contends that reversal is warranted for cumulative misconduct.  "[E]ven if there was no error or an error was harmless and so by itself does not warrant reversal, an incident may nonetheless contribute to a finding of persistent and pervasive misconduct." *State v. Roque*, 213 Ariz. 193, 228 ¶ 155, 141 P.3d 368, 403 (2006) (citation omitted).

¶49     Speer's argument fails.  The prosecutor made at least one unprofessional comment outside the presence of the jury. But, as we have noted above, this statement alone does not warrant a new trial, nor does the record demonstrate other persistent and pervasive misconduct.[6]

---

[6]     Speer's brief summarily alleges additional misconduct but fails to elaborate on any cited instance.  None of these incidents involved misconduct.

In the first incident, the prosecutor asked a police detective on redirect if he had fingerprinted the Sotos' children.  The trial court denied defendant's motion for mistrial because cross-examination had focused on poking holes in the police investigation.  In the second incident, the prosecutor also asked the detective if he had questioned Brian Womble about the state of the Sotos' apartment at the time of the shooting.  Speer contends that this question was a negative comment on Brian's assertion of his Fifth Amendment rights. Because the officer responded in the negative to the question, it is difficult to perceive prejudice, and the superior court later instructed the jury that no negative inference was to be

## Aggravation Phase

¶50    Speer contends that the evidence was insufficient to prove the "grave risk of death" aggravator.  This aggravator requires that "[i]n the commission of the offense the defendant knowingly created a grave risk of death to another person or persons in addition to the person murdered during the commission of the offense."  A.R.S. § 13-751(F)(3) (Supp. 2008).  A person acts "knowingly" when, "with respect to conduct or to a circumstance described by a statute defining an offense, . . . [the] person is aware or believes that the person's conduct is of that nature or that the circumstance exists."  A.R.S. § 13-105(10)(b) (Supp. 2008).

¶51    In evaluating sufficiency of the evidence, we typically determine whether there is substantial evidence supporting the jury verdict.  *See, e.g.*, *State v. Wallace*, 219 Ariz. 1, 6 ¶ 27, 191 P.3d 164, 169 (2008).  Because Speer committed the murder before August 1, 2002, however, we today instead must independently determine whether the State has established the aggravating circumstance beyond a reasonable doubt.  A.R.S. § 13-755(A) (Supp. 2008); *Anderson II*, 210 Ariz.

---

drawn from an accused's silence.  Finally, during a bench conference in the penalty phase, defense counsel complained that the prosecutor had been too loud in off-the-record statements, and the jury could hear her.  The court responded that it had not observed this and could not perceive any negative effect.

at 354 ¶ 119 & n.21, 111 P.3d at 396 & n.21; *see also State v. Andriano*, 215 Ariz. 497, 506 n.5, 161 P.3d 540, 549 n.5 (2007) (noting that traditional sufficiency analysis is subsumed under independent review).

¶52    The (F)(3) aggravator has three components:  (1) the "murderous act created a grave risk of death to" a third person; (2) defendant "knowingly created such a risk"; and (3) "there was a 'real and substantial likelihood' that the third person would be killed."  *State v. Tucker* (*Tucker II*), 215 Ariz. 298, 309 ¶ 21, 160 P.3d 177, 188 (2007).  The State argues that this aggravator was established because Speer sent Brian Womble to shoot the Sotos at night, knowing that a baby slept in their bedroom.[7]  Speer does not challenge that the State proved the first and third components of the aggravator.  He claims, however, that the State did not prove the "knowledge" component because any knowledge obtained by Brian on the night of the murder cannot be imputed to Speer and he did not personally have the requisite knowledge.

**A.**

**Imputation of Brian Womble's Knowledge to Speer**

¶53    We have not previously discussed whether the knowledge of the person who carries out a murder can be imputed to an

---

[7]    Enriqueta, an intended murder victim, does not qualify as a third person for establishing the (F)(3) aggravator.  *State v. McCall*, 139 Ariz. 147, 160-61, 677 P.2d 920, 933-34 (1983).

absent defendant for purposes of establishing the (F)(3) aggravator.[8] We have, however, addressed a similar question in the context of the "especially heinous, cruel or depraved" (F)(6) aggravator. *State v. Carlson* involved a defendant who hired two men to kill her mother. 202 Ariz. 570, 574-75 ¶¶ 5-6, 48 P.3d 1180, 1184-85 (2002). The victim underwent several surgeries before succumbing to her injuries. *Id.* at 575 ¶ 8, 48 P.3d at 1185. In sentencing Carlson to death, the trial court found the murder especially cruel. *Id.* ¶ 10. Our analysis of the (F)(6) aggravator in that case began from the premise that "[t]he 'specified statutory aggravators in Arizona's death penalty scheme are designed to narrow, in a constitutional manner, the class of first degree murderers who are death eligible.'" *Id.* at 582 ¶ 45, 48 P.3d at 1192 (quoting *State v. Soto-Fong*, 187 Ariz. 186, 202, 928 P.2d 610, 626 (1996)). In light of this purpose, *Carlson* rejected "a tort concept of foreseeability" in favor of "the criminal law concept of mens rea." *Id*. ¶ 47. The Court found that the evidence did not establish that Carlson intended or knew that the murder would be

---

[8] In *State v. Holsinger*, the defendant hired Cagnina to murder his wife's stepfather. 115 Ariz. 89, 91, 563 P.2d 888, 890 (1977). Cagnina broke into the stepfather's house and killed a third person, but only wounded the intended victim. *Id.* The trial judge found the "grave risk of death" aggravator established as to Holsinger. *Id.* at 98, 563 P.2d at 897. This Court affirmed Holsinger's death sentence, but the opinion did not analyze the propriety of the (F)(3) aggravator. *See id.*

carried out in a cruel manner because she "was not present during the commission of the crime, did not supply the murder weapon, and was not involved in planning the details or method of the murder." *Id.*

¶54    The same rationale guides us today.  Even if we assume arguendo that Brian Womble had the requisite knowledge of the risk to the infant while carrying out the murder, we do not impute that knowledge to Speer.  Rather, we must address the issue of Speer's personal knowledge.

**B.**

**Speer's Knowledge**

¶55    In evaluating the (F)(3) knowledge requirement, *State v. McGill*, 213 Ariz. 147, 140 P.3d 930 (2006), is instructive. McGill had "set two people on fire . . . in a very small apartment . . . us[ing] enough gasoline to cause the entire structure to quickly become engulfed in flames."  *Id.* at 154 ¶ 29, 140 P.3d at 937.  Although upholding the (F)(3) aggravator as to persons whom McGill knew were in the apartment, we stated that "[t]he trial court correctly granted McGill's motion to dismiss the aggravator as it related to [a person in an attached apartment] because McGill did not know that the attached apartment was occupied." *Id.* ¶ 27.

¶56    In contrast, in *State v. Fierro*, 166 Ariz. 539, 804 P.2d 72 (1990), we found knowledge established.  Fierro had

24

fired several bullets at the victim, who had exited a car. "One bullet struck [the victim] and two bullets struck the windshield[,] . . . narrowly missing" a third person who was seated in the car. *Id.* at 550, 804 P.2d at 83. We held that "the record supports the finding that Fierro had to have been aware of [the third person's presence] in the car," because the victim exited on the passenger side, one or both car doors remained open, the interior light remained on, and the third person called out to the victim several times. *Id.*

¶57 There is evidence that Speer knew that children lived in the Soto apartment and that the murder would be committed at night. There is also evidence that Speer knew that a child slept in the parent's bedroom, as a crib was likely in the room at the time of the burglary. Speer's knowledge that the child would be placed in danger by the murder plot can, of course, be established by circumstantial evidence. But, on independent review, we are unable to conclude beyond a reasonable doubt that Speer knew that the plan to murder the Sotos would place the infant in danger.

¶58 The evidence does not establish beyond a reasonable doubt that Speer knew the murder would take place in the Soto's bedroom. Nor does it establish that he knew that the murder would take place in such a way as to endanger the child, who

25

apparently was not in the crib at the time of the murder but instead under the sheets in the parents' bed.

¶59     Rather, the evidence establishes at most that Speer knew that a child would be present somewhere in the apartment. Speer was undoubtedly criminally reckless, *see* A.R.S. § 13-105(10)(c) (defining "recklessly"), but we cannot conclude beyond a reasonable doubt that he was "aware" or "believe[d]," *see* A.R.S. § 13-105(10)(b) (defining "knowingly"), that the child would be in the zone of danger.  We therefore find that the State did not establish the (F)(3) aggravator.

### IV.

### Penalty Phase

### A.

### Causal Nexus

¶60     Speer argues that Arizona law "unconstitutionally limits mitigation by requiring a causal nexus."  *See Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (holding that a jury cannot be prevented from considering mitigating evidence solely because the evidence has no causal "nexus" to a defendant's crimes).

¶61     The relevant statute, A.R.S. § 13-751(G) (Supp. 2008), does not require a causal nexus between mitigation and the murder.  Rather, the statute allows the jury to consider "as mitigating circumstances *any* factors proffered by the defendant or the state that are relevant in determining whether to impose

26

a sentence less than death, including *any* aspect of the defendant's character, propensities or record and *any* of the circumstances of the offense." *Id.* (emphasis added). The superior court specifically instructed the jury that, in addition to specific mitigating factors claimed by Speer, it could "consider anything else about the commission of the crime or Paul Speer's background or character that would mitigate against imposing the death penalty." Thus, the jury was entirely free to consider all mitigating evidence, whether or not it had a causal nexus to the murder.

## B.

### Closing Argument

¶62    Speer contends that the prosecutor's closing argument improperly limited the jury's consideration of mitigating factors by urging that evidence lacking a causal nexus to the crime should not be given weight. Speer did not object to this argument, so review is for fundamental error. *Anderson II*, 210 Ariz. at 349-50 ¶ 95, 111 P.3d at 391-92.

¶63    There is no error, let alone fundamental error. As Speer concedes, *Anderson II* held that although a jury may not be prevented from hearing mitigation evidence lacking a causal nexus to the crime, absence of such a nexus can be considered in evaluating the strength of that evidence. *Id*. at 350 ¶ 97, 111

27

P.3d at 392; *accord State v. Pandeli*, 215 Ariz. 514, 526 ¶ 32, 161 P.3d 557, 569 (2007).

## C.

## Presumption of Death

¶64    Speer contends that Arizona's death penalty sentencing statutes unconstitutionally create a presumption of death by placing the burden on a defendant to prove that mitigation is sufficiently substantial to call for leniency.

¶65    Under A.R.S. § 13-751(C), the defendant has the burden of establishing the existence of mitigating circumstances by a preponderance of the evidence.  Our statutes further provide that "[t]he trier of fact shall impose a sentence of death if the trier of fact finds one or more . . . aggravating circumstances . . . and then determines that there are no mitigating circumstances sufficiently substantial to call for leniency."  A.R.S. § 13-751(E).  Contrary to Speer's argument, we have made plain that this statutory scheme contains no presumption of death.  Neither party bears the burden of persuading the jury that the mitigation is sufficiently substantial to call for leniency; that determination "is not a fact question to be decided based on the weight of the evidence, but rather is a sentencing decision to be made by each juror based upon the juror's assessment of the quality and significance of the mitigating evidence that the juror has found

28

to exist." *State ex rel. Thomas v. Granville* (*Baldwin*), 211 Ariz. 468, 473 ¶ 21, 123 P.3d 662, 667 (2005).

¶66 Indeed, *State v. Harrod*, 218 Ariz. 268, 183 P.3d 519 (2008), rejected the argument that Speer now raises. The trial court in *Harrod* instructed the jury that "[i]f no jurors find the defendant proved any mitigation by a preponderance of the evidence, you must return a verdict of death." *Id.* at 281 ¶ 49, 183 P.3d at 532. We held that the instruction did not create a presumption of death and did not violate the Eighth Amendment "so long as jurors are allowed to consider any mitigating evidence." *Id.* (citing *Tucker II*, 215 Ariz. at 317 ¶ 73, 160 P.3d at 196). We also said that it was permissible to give an instruction that "a juror must vote to impose a sentence of death if he or she determines there is no mitigation at all or none sufficiently substantial to warrant a sentence less than death." *Id.* (citing *Tucker II*, 215 Ariz. at 318 ¶ 74, 160 P.3d at 197).

### D.

### Verdict Form

¶67 Speer contends that the trial court erred in refusing to provide the jury a special verdict form concerning mitigating factors. We have repeatedly rejected this argument. *See, e.g.*, *Tucker II*, 215 Ariz. at 319 ¶ 84, 160 P.3d at 198; *Roque*, 213 Ariz. at 226 ¶ 141, 141 P.3d at 401.

## E.

## Residual Doubt

**¶68** The superior court rejected Speer's proposed instruction on residual doubt as a mitigating circumstance and also denied his request to argue residual doubt as a mitigating circumstance. The court acted correctly. *See Harrod*, 218 Ariz. at 279-80 ¶¶ 39-46, 183 P.3d at 530-31 (finding no constitutional or statutory right to present residual doubt evidence during the penalty phase); *Cruz*, 218 Ariz. at 170 ¶ 133, 181 P.3d at 217 (holding that "a residual doubt instruction is not required by Arizona law" (citing *State v. Garza*, 216 Ariz. 56, 70 ¶ 67, 163 P.3d 1006, 1020 (2007))).

## F.

## Mistrial Motion

## 1.

**¶69** During the penalty phase, trial Juror 7 attended a social event and sat next to a deputy county attorney. After discovering her neighbor was a juror, the attorney excused herself and promptly notified the court. The court and counsel questioned Juror 7 about the incident before trial the next morning. During the questioning, an MCSO deputy brought Speer into the courtroom in handcuffs. The court immediately asked the deputy to bring Speer back in a few minutes and excused the juror.

30

¶70     Speer's attorney moved for a mistrial.  The court denied the motion, but offered to dismiss Juror 7 and seat the last remaining alternate.  Speer's counsel declined the offer because he believed that Juror 7 was favorable to returning a life sentence.

¶71     Juror 7 was then brought back into the courtroom.  She stated that seeing Speer in handcuffs did not affect her views about anything having to do with the case; she already knew that Speer was in jail from the trial evidence.  After Speer conferred with counsel, the court went through a colloquy with him and found that he made a knowing and voluntary waiver of the court's offer to dismiss Juror 7.

### 2.

¶72     Mistrial is the "most dramatic remedy for trial error and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted." *State v. Dann*, 205 Ariz. 557, 570 ¶ 43, 74 P.3d 231, 244 (2003). We review the denial of a motion for mistrial for abuse of discretion.  *State v. Jones*, 197 Ariz. 290, 304 ¶ 32, 4 P.3d 345, 359 (2000).

¶73     A capital defendant is generally entitled to be free from visible restraints in the courtroom during sentencing proceedings; a trial court abuses its discretion in allowing visible restraints in the absence of compelling circumstances,

31

such as security concerns. *Deck v. Missouri*, 544 U.S. 622, 633 (2005); *State v. Gomez*, 211 Ariz. 494, 502-03 ¶¶ 40-42, 123 P.3d 1131, 1139-40 (2005). Reversal is required for a *Deck* violation unless the State can demonstrate harmless error. *Deck*, 544 U.S. at 635.

¶74 On the other hand, "the inadvertent exposure of a handcuffed or shackled defendant to members of the jury outside the courtroom is not inherently prejudicial, and a defendant is not entitled to a new trial absent a showing of actual prejudice." *State v. Apelt*, 176 Ariz. 349, 361, 861 P.2d 634, 646 (1993); *see State v. Johnson*, 147 Ariz. 395, 399, 710 P.3d 1050, 1054 (1985) (noting that when "several jurors inadvertently saw the defendant in custody while on the way to the courtroom" the relevant question was "whether the defendant was prejudiced by what the jury saw"); *State v. Mills*, 196 Ariz. 269, 272 ¶¶ 9-12, 995 P.2d 705, 708 (App. 1999) (finding no error in superior court's refusal to grant a mistrial when defendant was twice seen by jurors in restraints outside courtroom because defendant had not established prejudice); *see also State v. Hernandez*, 4 So. 3d 642, 658 (Fla. 2009) (holding trial court did not err in refusing to grant a mistrial after juror saw person he thought was the defendant in shackles in the courthouse hallway).

¶75     In this case, a single juror saw Speer brought into the courtroom in restraints during a preliminary proceeding. We find this case more analogous to inadvertent exposure to a restrained prisoner during transportation than to restraint during trial. Because Speer was not restrained during trial, the considerations that led the Supreme Court to find inherent prejudice in *Deck* are not present. *See* 544 U.S. at 630-32 (noting that shackling during trial undermines presumption of innocence, interferes with right to assistance of counsel, and diminishes dignity of process); *id*. at 633 (noting that shackling during trial suggests that defendant is danger to the community).

¶76     Given Juror 7's statements, the superior court did not abuse its discretion in finding that Speer suffered no prejudice from the incident. Moreover, because only one juror saw Speer in restraints, the trial court's offer to seat an alternate would have obviated any prejudice. Having rejected that offer, Speer cannot now claim error.

## V.

### Independent Review

¶77     Because Speer committed the murder before August 1, 2002, this Court independently reviews the findings of aggravation and mitigation and the propriety of the death sentence. A.R.S. § 13-755(A) (Supp. 2008); *Anderson II*, 210

33

Ariz. at 354 ¶ 119 & n.21, 111 P.3d at 396 & n.21.  We "consider the quality and the strength, not simply the number, of aggravating and mitigating factors."  *Roque*, 213 Ariz. at 230 ¶ 166, 141 P.3d at 405 (citation and internal quotation marks omitted).

¶78       Although Speer's counsel questioned the propriety of a death sentence at oral argument, his briefs on appeal did not address this issue.  We have reminded capital defense counsel on two recent occasions of their professional obligation "to take advantage of all appropriate opportunities to argue why death is not a suitable punishment" for their client, and not to "simply rely on this Court's statutory duty to review the record."  *Garza*, 216 Ariz. at 71 ¶ 74 & n.16, 163 P.3d at 1021 & n.16 (citing *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (2003)); *Morris*, 215 Ariz. at 330 ¶ 76 & n.10, 160 P.3d at 209 & n.10 (same).  We emphasize that admonition again today.

¶79       Despite the failure of defense counsel to brief the issue, we are directed by A.R.S. § 13-755 to "review the evidence of aggravating and mitigating circumstances and independently determine whether death is the appropriate penalty."  *Garza*, 216 Ariz. at 71-72 ¶ 74, 163 P.3d at 1021-22.  We do so below.

## A.

## Aggravating Circumstances

¶80     The jury found four aggravating circumstances.  We determine de novo whether the aggravating circumstances were proved.  A.R.S. § 13-755(A); *State v. Cromwell*, 211 Ariz. 181, 191 ¶¶ 52-53, 119 P.3d 448, 458 (2005).  We have already concluded that the (F)(3) aggravator was not proved beyond a reasonable doubt.  *See* ¶¶ 50-59, *supra*.  Speer does not contest the other three aggravating circumstances, and we conclude that each was proved beyond a reasonable doubt.

## 1.

¶81     An aggravating circumstance is established when "[t]he defendant was previously convicted of a serious offense, whether preparatory or completed."  A.R.S. § 13-751(F)(2) (Supp. 2008). Robbery is a "serious offense."  A.R.S. § 13-751(I)(8).  The State proved that Speer was convicted of armed robbery on December 1, 1998.

## 2.

¶82     A murder committed for the purpose of witness elimination is especially heinous or depraved under § 13-751(F)(6).  *Tucker II*, 215 Ariz. at 312 ¶ 39, 160 P.3d at 191. Witness elimination is established when "the murder victim is a witness to some other crime, and is killed to prevent that person from testifying about the other crime."  *State v.*

35

*Johnson*, 212 Ariz. 425, 439 ¶ 57, 133 P.3d 735, 749 (2006). The State proved that Speer had Brian kill Adan so that Adan would be unable to testify in Speer's burglary trial.

### 3.

**¶83** An aggravating circumstance is established if "[t]he defendant committed the offense while in the custody of or on authorized or unauthorized release from the state department of corrections, a law enforcement agency or a county or city jail." A.R.S. § 13-751(F)(7). The murder in this case was committed while Speer was on parole from his armed robbery conviction and in the custody of the MCSO on the burglary charge.

### B.

### Mitigating Circumstances

**¶84** Speer claimed some twenty-three mitigating factors at trial.[9] Speer had the burden of proving the existence of any claimed mitigating factor. A.R.S. § 13-751(C). The State

---

[9] The claimed factors were: 1) the defendant's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was impaired; 2) minor participation; 3) age; 4) history of family instability; 5) history of family tragedy; 6) parental domestic violence; 7) parental drug and alcohol abuse; 8) genetic propensity towards addiction; 9) genetic propensity towards mental illness; 10) low IQ; 11) learning disability; 12) long-standing substance abuse disorder/addiction to drugs and alcohol; 13) co-defendant suffered from mental illness at the time of the crime; 14) cultural trauma; 15) physical abuse; 16) sexual abuse; 17) emotional abuse; 18) neglect; 19) poverty; 20) institutional failure/trauma; 21) mercy; 22) defendant suffered from any form of mental disorder; and 23) any other relevant factor.

contested a number of these factors and presented contrary evidence. In light of Speer's failure to address the issue on appeal, we do not know today which factors Speers contends were proved. Despite counsel's failure to assist the Court in this regard, we have thoroughly reviewed the record to carry out our statutory duty of independent review. We describe below the mitigating circumstances that we find proved by a preponderance of the evidence.

## 1.

¶85 Speer proved that he suffered a difficult childhood. He grew up in what even the State's expert witness conceded was "a dysfunctional home." Drug abuse was pervasive in his family, and his mother used heroin during pregnancy. Speer was referred to juvenile court twenty-six times for various crimes. He was incarcerated twelve times between his fourteenth and eighteenth birthdays.

¶86 Speer proved at least some physical abuse during childhood. He presented evidence of sexual abuse by a female relative at age five. Speer also showed that during his early school years, his mother refused recommended evaluations of suspected learning disabilities.

## 2.

¶87 The record also establishes that Speer habitually abused both alcohol and drugs. Speer began using drugs in his

37

early adolescence, overdosing on methamphetamines when thirteen years old. He was sent to drug treatment as a juvenile. Speer later became addicted to heroin and apparently committed the March 14 burglary to get money to buy heroin.

**3.**

¶88        Speer and the State presented sharply conflicting evidence on mental health issues. Speer's experts claimed that he had moderate to severe cognitive impairment, post-traumatic stress disorder ("PTSD"), depression, and a low IQ. The State's expert agreed that Speer suffered from depression but concluded that Speer was malingering cognitive impairment and had antisocial personality disorder, not PTSD.

¶89        After reviewing the expert testimony and the other evidence presented, we conclude that Speer proved that he suffered from depression. We also conclude that Speer proved that he had an IQ between 87 and 97.

¶90        We do not conclude that Speer proved significant cognitive impairment. Whatever the formal diagnosis of Speer's mental health, the record makes plain that he had a clear ability to think ahead and understand the wrongfulness of his actions. Speer meticulously planned the murder while in custody, cleverly used code in communicating with Brian, easily evaded various MCSO phone restrictions on outgoing prisoner

38

calls, and repeatedly urged that Brian dispose of incriminating evidence.

## 4.

¶91    Speer also proved that the death penalty would have negative effects on his family. Speer presented evidence that he has a child, and established that an execution would have a very negative effect on his extended family.

## C.

### Propriety of the Death Sentence

¶92    The jury found four aggravating circumstances. Our independent review confirms that the (F)(2), (F)(6), and (F)(7) aggravators were proved beyond a reasonable doubt. Having set aside the jury's finding of the (F)(3) aggravator, we must now "independently determine" if the mitigation is "sufficiently substantial to warrant leniency in light of the existing aggravation." A.R.S. § 13-755(B).

¶93    As noted above, the record is not bereft of mitigating evidence. Among other things, Speer suffered a difficult childhood and serious drug abuse. But that history is not in itself sufficient to warrant leniency in this case.[10]

---

[10] In *Hampton*, we acknowledged the defendant's "horrendous childhood" but nonetheless affirmed a death sentence, noting that "difficult family background, in and of itself, is not a mitigating circumstance sufficient to mandate leniency in every capital case." 213 Ariz. 167, 185 ¶ 89, 140 P.3d 950, 968 (2006) (internal quotation marks and citation omitted).

39

**¶94** Nor do Speer's mental health issues warrant leniency under the circumstances of this case. This was not a crime of passion or an impetuous reaction to difficult circumstances. For almost a month, Speer planned the murder of two innocent victims of a burglary that he had committed, with the goal of avoiding the consequences of his prior crime. The three aggravating circumstances – prior serious conviction, witness elimination, and committing the offense while on parole or in custody – are cumulatively entitled to substantial weight. And, the factor of witness elimination is in itself especially weighty, as it involves a direct affront to the functioning of the justice system. *See Johnson*, 212 Ariz. at 439 ¶¶ 59-60, 133 P.3d at 749 ("Killings committed with this cold-blooded logic in mind are especially depraved, and separate the crime from the 'norm' of first-degree murders." (internal quotation marks and citations omitted)).

**¶95** Having considered the entire record, we conclude that the mitigating evidence, in the aggregate, is not sufficiently substantial to call for leniency. We therefore affirm the sentence of death for the first degree murder of Adan Soto.

_____

Similarly, *State v. Ellison* noted that even if the defendant's "childhood experiences left him less equipped to make good moral decisions . . . [he] was not actually incapable of telling right from wrong. His childhood troubles deserve little value as a mitigator for the murder he committed at age thirty-three." 213 Ariz. 116, 144 ¶ 136, 140 P.3d 899, 927 (2006).

## VI.

## Conclusion

¶96     For the foregoing reasons, we affirm the judgment of conviction for first degree murder and the sentence of death.

_____
                    Andrew D. Hurwitz, Vice Chief Justice

CONCURRING:

_____
Rebecca White Berch, Chief Justice

_____
Michael D. Ryan, Justice

_____
W. Scott Bales, Justice

_____
Ruth V. McGregor, Justice (Retired)

1.      The fact-finder in capital cases must be able to consider *all* relevant mitigating evidence in deciding whether to give the death penalty.  *See Woodson v. North Carolina*, 428 U.S. 280, 304 96 S. Ct. 2978, 49 L.Ed.2d 944 (1976).  The trial court's failure to allow the jury to consider and give effect to *all* mitigating evidence in this case by limiting its consideration to that proven by a preponderance of the evidence is unconstitutional under the Eighth and Fourteenth Amendments. This court rejected this argument in *State v. McGill*, 213 Ariz. 147, 161 ¶ 59, 140 P.3d 930, 944 (2006), *cert. denied*, ___ U.S. ___, 127 S.Ct 1914, 167 L.Ed.2d 570 (2007).  *See also State v. Medina*, 193 Ariz. 504, 514-15, 43, 975 P.2d 94, 104-05 (1999).

2.      The F.6 "especially heinous, cruel or depraved" aggravating factor is unconstitutionally vague and overbroad because the jury does not have enough experience or guidance to determine when the aggravator is met.  The finding of this aggravator by a jury violates the Eighth and Fourteenth Amendments because it does not sufficiently place limits on the discretion of the sentencing body, the jury, which has no "narrowing constructions" to draw from and give "substance" to the otherwise facially vague law.  This court rejected this argument in *State v. Cromwell*, 211 Ariz. 181, 188-90 ¶¶ 38-45, 119 P.3d 448, 455-57 (2005), *cert. denied* ___ U.S. ___, 126 S.Ct

2291, 164 L.Ed.2d 819 (2006), and *Anderson II*, 210 Ariz. at 353 ¶ 114, 111 P.3d at 395.

3.       The court also instructed the jury that they "must not be influenced by mere sympathy or by prejudice in determining these facts."  These instructions limited the mitigation the jury could consider in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments and Article 2, Sections 1, 4, 15, 23, and 24 of the Arizona Constitution.  We rejected this argument in *State v. Carreon*, 210 Ariz. 54, 70-71 ¶¶ 81-87, 107 P.3d 900, 916-17, *cert. denied*, 546 U.S. 854, 126 S.Ct. 122, 163 L.Ed.2d 129 (2005).

4.       The death penalty is cruel and unusual under any circumstances and violates the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution.  This Court and the United States Supreme Court have rejected this argument.  *Gregg v. Georgia*, 428 U.S. 153, 186-87, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *State v. Harrod,* 200 Ariz. 309, 320 ¶ 59, 26 P.3d 492, 503 (2001), *vacated on other grounds*, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002)(mem.).

5.       The death penalty is irrational and arbitrarily imposed; it serves no purpose that is not adequately addressed by life in prison, in violation of the defendant's right to due process under the Fourteenth Amendment to the United States Constitution and Article 2, Sections 1 and 4 of the Arizona

43

Constitution.  This court rejected these arguments in *State v. Smith*, 203 Ariz. 75, 82 ¶¶ 35-36, 50 P.3d 825, 832 (2002), and *State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

6.      The prosecutor's discretion to seek the death penalty has no standards and therefore violates the Eighth and Fourteenth Amendments, and Article 2, Section 1, 4, and 15 of the Arizona Constitution.  This court rejected this argument in *State v. Sansing*, 200 Ariz. 347, 361 ¶ 46, 26 P.3d 1118, 1132 (2001), *vacated on other grounds*, 536 U.S. 954, 122 S.Ct. 2654, 153 L.Ed.2d 830 (2002) (mem.).  *See also State v. Finch*, 202 Ariz. 410, 419 ¶ 50, 46 P.3d 421, 430 (2002).

7.      Arizona's death penalty is applied so as to discriminate against poor, young, and male defendants in violation of Article 2, Sections 1, 4, and 13 of the Arizona Constitution.  This court rejected this argument in *Sansing*, 200 Ariz. at 361 ¶ 46, 26 P.3d at 1132.  *See also State v. Stokley*, 182 Ariz. 505, 516, 898 P.2d 454, 465 (1995).

8.      Proportionality review serves to identify which cases are above the "norm" of first degree murder, thus narrowing the class of defendants who are eligible for the death penalty.  The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments, and

44

Article 2, Section 15 of the Arizona Constitution. This court rejected this argument in *State v. Gulbrandson*, 184 Ariz. 46, 73, 906 P.2d 579, 606 (1995). *See also State v. Salazar*, 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992).

9. Arizona's capital sentencing scheme is unconstitutional because it does not require the State to prove the death penalty is appropriate or require the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances. Instead, Arizona's death penalty statute requires defendants to prove their lives should be spared, in violation of the Fifth, Eighth, and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. This court rejected this argument in *State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988). *See also Carreon*, 210 Ariz. at 76 ¶ 122, 107 P.3d at 922.

10. Arizona's death penalty scheme does not sufficiently channel the sentencing jury's discretion. Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty. Arizona Revised Statutes section 13-703.01 is unconstitutional because it provides no objective standards to guide the jury in weighing the aggravating and mitigating circumstances. The broad scope of Arizona's aggravating factors

45

encompasses nearly anyone involved in a murder, in violation of the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. This court rejected this argument in *State v. Pandeli*, 200 Ariz. 365, 382 ¶ 90, 26 P.3d 1136, 1153 (2001), *vacated on other grounds*, 536 U.S. 953, 122 S.Ct. 2654, 153 L.Ed.2d 830 (2002)(mem.). *See also State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991).

11.     Execution by lethal injection is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. This court rejected this argument in *State v. Van Adams*, 194 Ariz. 408, 422 ¶ 55, 984 P.2d 16, 30 (1999), and *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

12.     Arizona's death penalty scheme unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist, in violation of the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. Arizona's death penalty law cannot constitutionally presume that death is the appropriate default sentence. This court rejected this argument in *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).