NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

TONY PEREZ MARQUEZ, *Appellant.*

No. 1 CA-CR 17-0619
FILED 10-09-2018

Appeal from the Superior Court in Maricopa County
No. CR2016-154614-001
The Honorable Richard L. Nothwehr, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Eric Knobloch
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Jesse Finn Turner
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Presiding Judge Jennifer M. Perkins and Judge Jon W. Thompson joined.

---

**W I N T H R O P**, Judge:

**¶1**        Tony Marquez appeals his convictions and sentences for misconduct involving weapons, threatening or intimidating, and assault. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

**¶2**        We view these facts in a light most favorable to sustaining the verdicts. *State v. Payne*, 233 Ariz. 484, 509, ¶ 93 (2013).  While parking her car at her apartment complex, A.F. heard a woman scream and quickly exited her vehicle.  Turning in the direction of the commotion, A.F. then saw Marquez gripping M.G.'s neck and heard M.G. begging him to "stop" and "leave [her] alone."

**¶3**        Concerned, A.F. approached Marquez and yelled, "knock it off."  In response, Marquez immediately released M.G., turned toward A.F., and said, "[t]his is between me and my wife[,] [m]ind your business."

**¶4**        At that point, A.F.'s friend and fellow resident, S.B., approached Marquez and attempted to intervene.  Moments later, A.F.'s boyfriend, C.D., also joined the group.  Confronted by S.B. and C.D., Marquez redirected his aggression and threatened to physically attack both men.

**¶5**        Meanwhile, with Marquez' focus shifted away from her, M.G. reached inside his jacket, withdrew an object that resembled a gun, and stated, "this is mine" and "I'm taking this before you can use it."  M.G. then fled, with Marquez chasing after her, and A.F. called the police.

**¶6**        When responding officers arrived at the scene a few minutes later, they repeatedly knocked on M.G.'s apartment door to no avail. Unable to make contact at the door, the officers then called her phone number.  After numerous attempts, M.G. eventually answered her phone and spoke with an officer for approximately twenty minutes before emerging from her apartment with her children.  Once she exited the

apartment, M.G. told officers that no one else was inside. Nonetheless, officers swept the apartment but failed to locate Marquez. When they returned a short time later, however, the officers heard movement overhead and, with some difficulty, coaxed Marquez down from the attic. After taking Marquez into custody, officers searched M.G.'s apartment and found a handgun hidden inside a pink, child-sized backpack.

¶7 The State charged Marquez with one count of misconduct involving weapons (Count 1), one count of disorderly conduct (Count 2), two counts of threatening or intimidating (Counts 3 and 4), and one count of assault (Count 5). The State also alleged aggravating circumstances and that Marquez had historical prior felony convictions and was on supervised release at the time he committed the underlying offenses.

¶8 The parties agreed to a jury trial as to Count 1. The remaining charges were simultaneously tried to the bench. At trial, M.G. acknowledged her ongoing romantic relationship with Marquez. She also admitted that on the evening in question they had an argument outside her apartment. M.G. denied that Marquez had hit or choked her. She also explained that during their heated exchange she struck Marquez' face with her cell phone, causing him to grab it and place it inside his jacket. According to M.G., when A.F., S.B., and C.D. approached them, she retrieved her cell phone from Marquez' jacket because she feared that she may need to call for help. Acknowledging she had lied to police officers when she denied that Marquez was in her apartment, M.G. nonetheless maintained that she was truthful when she told them that she, alone, owned and hid the handgun. Indeed, M.G. testified that Marquez never knew she had a gun in her apartment.

¶9 During closing argument, defense counsel acknowledged that Marquez was on community supervision at the relevant time, thereby conceding that he was prohibited from possessing a gun. Relying on M.G.'s testimony, defense counsel contested, however, the State's assertion that Marquez had possessed a handgun on the day in question.

¶10 A jury found Marquez guilty of misconduct involving weapons and one aggravating circumstance (committing the offense while on community supervision). After granting the State's motion to dismiss the count of disorderly conduct, the court found Marquez guilty of assault and both counts of threatening or intimidating. In addition, the court found Marquez had five prior felony convictions, and sentenced him to a slightly aggravated term of eleven years' imprisonment on Count 1, and to time served on the remaining counts. Marquez timely appealed, and we have

jurisdiction pursuant to Arizona Revised Statutes sections 12-120.21(A)(1), 13-4031, and -4033(A)(1).

## ANALYSIS

### I. Alleged Prosecutorial Misconduct

**¶11** Marquez contends the superior court improperly denied both of his motions to dismiss predicated on claims of prosecutorial misconduct. We review the denial of a motion to dismiss on grounds of prosecutorial misconduct for an abuse of discretion. *See State v. Trani*, 200 Ariz. 383, 384, ¶ 5 (App. 2001).

**¶12** Prosecutorial misconduct is "not merely the result of legal error, negligence, mistake or insignificant impropriety." *Pool v. Superior Court*, 139 Ariz. 98, 108 (1984). Rather, viewed in its entirety, it is "intentional conduct" that the prosecutor "knows to be improper and prejudicial, and which he pursues for any improper purpose." *Id.* at 108-09.

**¶13** To prevail on a claim of prosecutorial misconduct, the "defendant must show that the offending statements [or conduct], in the context of the entire proceeding, so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Newell*, 212 Ariz. 389, 402, ¶ 60 (2006) (internal quotation omitted). Under this standard, improper comments by a prosecutor will not warrant reversal of a defendant's convictions unless there is a "reasonable likelihood" that the "misconduct could have affected the jury's verdict" and deprived the defendant of the right to a fair trial. *Id.* at 403, ¶ 67 (internal quotation omitted).

**¶14** Nonetheless, even when individual acts of prosecutorial misconduct are harmless, the cumulative effect of the incidents may demonstrate "that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant." *State v. Roque*, 213 Ariz. 193, 228, ¶ 155 (2006) (internal quotation omitted), *overruled on other grounds by State v. Escalante-Orozco*, 241 Ariz. 254, 267, ¶¶ 11-15 (2017). Therefore, after reviewing each incident for error, "we must evaluate their cumulative effect on the trial." *Id.*

### A. Denial of First Motion to Dismiss

**¶15** At the final trial management conference held approximately six weeks before trial, defense counsel challenged, among other things, the

prosecutor's failure to respond to her interview requests for victims S.B. and A.F. In response, the prosecutor avowed that he had been unable to locate the victims. Notwithstanding this avowal, the court ordered the prosecutor to respond to the interview requests within five days indicating whether the victims would or would not consent to an interview by defense counsel.

¶16        The prosecutor failed to comply with the court's five-day deadline. Twelve days after the trial management conference, the prosecutor disclosed that S.B. had consented to an interview with defense counsel. Because of transportation issues, however, S.B. subsequently cancelled two in-person interviews. During a telephonic interview held in lieu of the second cancelled in-person interview, defense counsel asked whether S.B. knew that defense counsel was willing to interview him at his residence. Acknowledging that the prosecutor had informed him accordingly, S.B. stated that he preferred a telephonic interview. Nonetheless, when defense counsel pressed the issue and explained that she wanted to question him regarding certain pictures and videos, S.B. consented and submitted to an in-person interview. With respect to A.F., approximately two weeks past the court's deadline, the prosecutor informed defense counsel that he had finally reached her by telephone, but A.F. had declined to submit to an interview.

¶17        Approximately a month before trial, Marquez moved to dismiss the charges, alleging the prosecutor had engaged in misconduct by: (1) failing to timely respond to defense counsel's requests for interviews with victims S.B. and A.F.; (2) lying to defense counsel when he claimed that victim S.B. would only submit to a telephonic rather than an in-person interview; (3) thwarting defense counsel's access to victim A.F.; (4) failing to provide a list of jail calls he anticipated to use at trial; and (5) impugning defense counsel's integrity.

¶18        After holding a two-day hearing on the motion, the superior court reprimanded both the prosecutor and defense counsel for maligning "each other's reputations," and concluded: (1) the State had failed to timely disclose the victims' availability for interviews; (2) Marquez had suffered no prejudice as a result of these "inconsequential" delays; and (3) the prosecutor had engaged in conduct "unbecoming of a member of the Arizona Bar Association," but his behavior did not rise to the level of misconduct. Accordingly, the court found no evidence of prosecutorial misconduct and denied the motion to dismiss.

¶19 Contrary to Marquez' assertions, nothing in the record suggests that the prosecutor impeded defense counsel's interviews with S.B. and A.F. It is uncontroverted that defense counsel conducted an interview of S.B. weeks in advance of trial, and although S.B. ultimately submitted to an in-person interview, he initially expressed his preference for a telephonic format. Likewise, the parties do not dispute that A.F. refused to submit to questioning before trial. At trial, defense counsel asked A.F. about her failure to submit to a defense interview, and A.F. confirmed that she refused defense counsel's invitation. Therefore, as found by the superior court, the prosecutor's failure to timely disclose the victims' availability was wholly inconsequential.

¶20 Furthermore, consistent with the superior court's findings, the record reflects that *both* attorneys resorted to personal attacks rather than properly limiting their remarks to the substance of their respective positions. While defense counsel accused the prosecutor and his staff of dishonesty, the prosecutor characterized defense counsel's conduct as "dirty" "antics" and "shenanigans." These inappropriate comments preceded trial, however, and were not made in the presence of the jury. Given these facts, there is no basis to conclude that the statements deprived Marquez of a fair trial. *See State v. Speer*, 221 Ariz. 449, 458, ¶ 44 (2009) (concluding the prosecutor's "entirely unprofessional" statements uttered "outside the presence of the jury" did not deprive the defendant of a fair trial). Indeed, any claim that the prosecutor's comments compromised defense counsel's standing with the court and thereby hindered her representation is belied by her subsequent stipulation to try the misdemeanor charges to the bench. Therefore, the superior court did not abuse its discretion by denying Marquez' first motion to dismiss.

### B. Denial of Second Motion to Dismiss

¶21 In response to defense counsel's questioning at trial, an officer testified that forensic analysis revealed "no fingerprints [] of value" on the gun. On redirect, the prosecutor likewise questioned the officer regarding the test results, and he reiterated that "[n]othing of evidentiary value [was] located on the gun."

¶22 During closing argument, defense counsel asserted that the test results proved that Marquez had never handled the gun. In rebuttal, the prosecutor acknowledged that Marquez' fingerprints were not on the seized gun but countered, "they found no fingerprints, not one single fingerprint on that handgun." Based on this forensic analysis, the prosecutor arguably invited the jurors to infer that fingerprints may have

been wiped from the gun while M.G. and Marquez were alone in the apartment. In addition, the prosecutor asked the jurors to review a 9-1-1 call that had been played during the trial and assess for themselves "how certain" the witnesses "were of the things that they saw immediately after the incident happened."

**¶23**      During deliberations, the jurors submitted a question to the court inquiring whether they could consider a portion of the 9-1-1 call that relayed S.B.'s direct communication with an emergency operator, even though that conversation was not presented at trial. To ascertain whether the jurors had already listened to the unadmitted section of the call, the court questioned the jury foreman outside the presence of the other jurors. The foreman explained that the jurors had immediately stopped the recording as soon as they heard S.B.'s voice. Satisfied that the jurors had not considered the unadmitted portion of the exhibit, the court then submitted a redacted recording to the jury, which matched the recording played during trial.

**¶24**      A week after trial, defense counsel submitted a second motion to dismiss predicated on prosecutorial misconduct, reasserting her original claims and arguing that the prosecutor intentionally: (1) misstated evidence during closing argument, and (2) submitted an exhibit for jury deliberation that had not been presented at trial. After holding a hearing on the motion, the superior court found: (1) the prosecutor did not intentionally or knowingly submit the unredacted 9-1-1 call to the jury; (2) the jurors never listened to the challenged portion of the 9-1-1 recording; (3) Marquez sustained "absolutely no prejudice" from the errant submission of the recording to the jurors for deliberation; and (4) testimony from trial supported the prosecutor's closing argument regarding the lack of fingerprints on the handgun.

**¶25**      While prosecutors may not make unsupported "insinuations," they have "wide latitude in presenting their arguments to the jury," and may argue all reasonable inferences from the evidence. *State v. Morris*, 215 Ariz. 324, 336, ¶ 51 (2007) (internal quotation omitted). Here, the prosecutor's statement that no fingerprints were found on the gun was reasonably supported by the officer's testimony that nothing of evidentiary value was found on the weapon. Moreover, contrary to Marquez' claims, the underlying forensic report substantiated, rather than contradicted, the officer's testimony. The report stated no prints were found on the gun, though noting some prints were found on the magazine. Given the undisputed evidence that someone placed the gun in a child's backpack,

the lack of fingerprints on the gun supported the State's arguable inference that someone may have wiped it.

**¶26** Likewise, there is nothing in the record to suggest that the prosecutor engaged in misconduct by submitting the unredacted recording, and we defer to the superior court's credibility determination that the prosecutor's errant submission was not an intentional act. *See State v. Martinez*, 230 Ariz. 208, 215, ¶¶ 30-32 (2012) (concluding the prosecutor's "courtroom demeanor was inappropriate," but deferring to the superior court's "firsthand observations and assessments" as to whether such conduct amounted to "pervasive misconduct"). Nonetheless, even if the prosecutor intentionally submitted the unadmitted exhibit, the record reflects that Marquez sustained no resulting prejudice because the jury never heard S.B.'s conversation with the emergency operator.

**¶27** Furthermore, although Marquez argues the cumulative effect of the prosecutor's conduct both before and at trial caused him prejudice, having found no action by the prosecutor that constitutes misconduct, "there can be no cumulative effect of misconduct sufficient to permeate the entire atmosphere of the trial with unfairness." *State v. Bocharski*, 218 Ariz. 476, 492, ¶ 75 (2008). Therefore, the superior court did not abuse its discretion by denying Marquez' second motion to dismiss.

## II. Alleged Judicial Bias

**¶28** Marquez argues the trial judge made "critical remarks" regarding defense counsel that demonstrated "prejudicial bias." Accordingly, he contends the superior court improperly denied his request for a change of judge for cause. We review a superior court's ruling on a claim of judicial bias for an abuse of discretion. *State v. Ramsey*, 211 Ariz. 529, 541, ¶ 37 (App. 2005).

**¶29** "The constitutional right to a fair trial includes the right to a fair and impartial judge." *State v. Ellison*, 213 Ariz. 116, 128, ¶ 35 (2006). Under Arizona Rules of Criminal Procedure 10.1 ("Rule 10.1"), "a defendant is entitled to a new judge if a fair and impartial hearing or trial cannot be had by reason of the interest or prejudice of the assigned judge." *Id.* (internal quotation omitted).

**¶30** Because judges are presumed to be impartial, "the party moving for change of judge must prove a judge's bias or prejudice by a preponderance of the evidence." *Id.* at ¶ 37 (internal quotation omitted). To meet this burden, the moving party must set forth "concrete facts" demonstrating the judge's partiality, and may not rely "on mere

speculation, suspicion, apprehension, or imagination." *Id.* (internal quotation omitted).

**¶31** Moreover, opinions that a judge forms "on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 129, ¶ 38 (internal quotation omitted). Indeed, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Id.* at ¶ 40 (internal quotation omitted).

**¶32** Approximately a month after trial, defense counsel filed a motion for change of judge pursuant to Rule 10.1, detailing her belief that the appointed judge, Commissioner Richard Nothwehr, held personal disdain and ill-will toward her, and requesting a new judge for Marquez' trial on priors and sentencing. To substantiate her request, defense counsel noted that Commissioner Nothwehr had: (1) denied several of Marquez' pretrial motions; (2) granted the State's motion to strike from Marquez' motions any language that characterized the prosecutor as lying, misrepresenting, or obstructing; (3) reserved for a future date any determination as to whether defense counsel's conduct warranted sanctions; and (4) scolded defense counsel for repeatedly interrupting the State's closing argument.

**¶33** A hearing on the motion was held before an impartial judge, the Honorable Samuel Myers. After reviewing the record and hearing from the parties, Judge Myers denied the request for a change of judge, finding: (1) Commissioner Nothwehr did not threaten defense counsel with possible sanctions, but simply stated, in granting the State's motion to strike, that he had not "made any findings in support of or against a bar complaint"; (2) Commissioner Nothwehr was, at times, frustrated with defense counsel; and (3) the record did not reveal whether Commissioner Nothwehr "dislike[d] counsel."

**¶34** As found by Judge Myers, Marquez failed to set forth any facts demonstrating bias or prejudice that required Commissioner Nothwehr's disqualification under Rule 10.1. Although defense counsel asserts Commissioner Nothwehr's rulings on various motions demonstrate prejudice, the challenged rulings do not reveal any extra-judicial source of bias or deep-seated favoritism. Mere dissatisfaction with a judge's rulings does not warrant a change of judge. *See Ellison*, 213 Ariz. at 129, ¶ 40. Likewise, Commissioner Nothwehr's admonitions to defense counsel regarding her frequent objections during the State's closing argument do

not demonstrate bias because "a judge does not display bias or cause prejudice when acting sua sponte to control the courtroom and trial." *State v. Goudeau*, 239 Ariz. 421, 450, ¶ 93 (2016) (internal quotation omitted); *see also Liteky v. United States*, 510 U.S. 540, 556 (1994) ("A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune" to a partiality challenge.). Moreover, consistent with Judge Myers' findings, manifest frustration and annoyance do not render a judicial officer unfit to preside over a legal proceeding. *See Liteky*, 510 U.S. at 555-56 (holding "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display" do not establish bias or partiality). Therefore, the motion for change of judge for cause was properly denied.

### III. *Denial of Requested Jury Instruction*

**¶35** Marquez contends the superior court erroneously denied his requested jury instruction regarding constructive possession. We review a superior court's denial of a requested jury instruction for an abuse of discretion, deferring to the court's evaluation of the evidence. *State v. Wall*, 212 Ariz. 1, 3, 5, ¶¶ 12, 23 (2006). We will not reverse a court's "refusal unless the defendant suffered prejudice as a result." *State v. Garfield*, 208 Ariz. 275, 278, ¶ 11 (App. 2004). We affirm a court's ruling "if legally correct for any reason and, in doing so, we may address the state's arguments to uphold the court's ruling even if those arguments otherwise could be deemed waived by the state's failure to argue them below." *State v. Huez*, 240 Ariz. 406, 412, ¶ 19 (App. 2016).

**¶36** A party is entitled to a jury instruction on any theory reasonably supported by the evidence. *State v. Moody*, 208 Ariz. 424, 467, ¶ 197 (2004). Nevertheless, a court does not err by refusing to give a jury instruction that "does not fit the facts of the particular case, or is adequately covered by the other instructions." *State v. Hussain*, 189 Ariz. 336, 337 (App. 1997); *see also State v. Mott*, 187 Ariz. 536, 546 (1997) ("A trial court is not required to give a proposed instruction when its substance is adequately covered by other instructions.").

**¶37** Citing *State v. Kerr*, 142 Ariz. 426 (App. 1984), Marquez requested the following instruction on constructive possession: "Constructive possession does not apply to an individual who merely lives with another person who can lawfully possess a firearm, and this other individual possesses a firearm in the home."

¶38        During the settling of final jury instructions, defense counsel explained that without her proposed instruction the jury could convict Marquez of misconduct involving weapons based on his presence in M.G.'s apartment while she lawfully possessed a handgun.  After hearing from the parties, the court denied the requested instruction, explaining that the approved instructions already required the State to prove that Marquez knowingly exercised dominion or control over the gun, and therefore he could not be convicted of misconduct involving weapons based on his mere presence near a handgun.

¶39        In its final instructions to the jury, the superior court provided the following definition of "possession":

> The law recognizes different types of possession. "Actual possession" means the defendant knowingly had direct physical control over an object.  "Constructive possession" means the defendant, although not actually possessing an object, knowingly exercised dominion or control over it, either acting alone or through another person. "Dominion or control" means either actual ownership of the object or power over it.  Constructive possession may be proven by direct or circumstantial evidence.

> Both actual and constructive possession may be sole or joint.  "Sole possession" means the defendant, acting alone, had actual or constructive possession of an object.  "Joint possession" means the defendant and one or more persons shared actual or constructive possession of an object.

> You may find that the element of possession, as the term is used in these instructions, is present if you find beyond a reasonable doubt that the defendant had actual or constructive possession, either acting alone or with another person.

¶40        As noted by the State, *Kerr* does not support Marquez' requested instruction because, unlike this case, the defendant in *Kerr* was charged with possession of prohibited weapons and the court expressly rejected any argument regarding the defendant's status as a prohibited possessor.  *Kerr*, 142 Ariz. at 147-48, 151 n.1; *see also State v. Coley*, 158 Ariz. 471, 471 (App. 1988) (explaining *Kerr* applies to cases dealing with "possession of prohibited weapons, not the possession of deadly weapons by prohibited possessors").  More importantly, as found by the superior

court, the given instructions adequately stated the law and required the State to prove that Marquez either actually possessed or knowingly exercised dominion and control over the gun. In other words, the jury was properly instructed that Marquez' mere proximity to a gun did not constitute misconduct involving weapons. Therefore, the superior court did not abuse its discretion by denying Marquez' requested constructive possession instruction.

## CONCLUSION

¶41      For the foregoing reasons, we affirm the convictions and sentences.

